The **LONG ISLAND RAILROAD COM-
PANY**, Plaintiff,

v.

The **UNITED STATES** of America and
Interstate Commerce Commission,
Defendants.

Civ. No. 70–C–700.

United States District Court,
E. D. New York.

July 22, 1970.

George M. Onken, Jamaica, N.Y. (Richard H. Stokes, Jamaica, N.Y., of counsel), for plaintiff.

Leonard S. Goodman, Associate Gen. Counsel, I.C.C., Washington, D. C. (Richard W. McLaren, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Edward R. Neaher, United States Atty., E. D. N. Y., Brooklyn, N. Y., Robert W. Ginnane, Gen. Counsel, I.C.C., on the brief), for defendants the United States and I.C.C.

Lewis T. Duerinck, Chicago, Ill., for Chicago and North Western Railway Co.

Before FRIENDLY, Circuit Judge, MISHLER, Chief District Judge, and BARTELS, District Judge.

FRIENDLY, Circuit Judge:

The Long Island Railroad asks us to enjoin the enforcement of an order of the Interstate Commerce Commission in Ex parte No. 252 (Sub. No. 1) Incentive Per Diem Charges—1968, made under § 1(14) (a) of the Interstate Commerce Act. The order adopted rules and regu- lations establishing additional "incentive" per diem charges for unequipped boxcars from September 1 through February of each year.[1] The Long Island does not claim a lack of substantial evidence or of rational basis for the order if the Commission was entitled to rely on the study hereafter described without allowing this to be tested and rebutted at an oral hearing. Its criticisms go rather to procedure.[2] Chicago & Northwestern Railway Company intervened in support of the order.

The order is the latest chapter in a long history of freight-car shortages in certain regions and seasons and of attempts to ease them. Power over car service and payments by a railroad for the use of cars not owned by it was first conferred on the Commission by the Esch Car Service Act of 1917, 40 Stat. 101. One provision added to the Interstate Commerce Act a new section, now § 1(14) (a):

> The commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service, including the classification of cars, compensation to be paid for the use of any car not owned by any such common carrier and the penalties or other sanctions for nonobservance of such rules.

Another provision added the predecessor of § 1(15), which empowers the Commission, whenever it is "of opinion that shortage of equipment, congestion of traffic, or other emergency requiring

---

1. While the order became effective on June 1, 1970, payments will first become due for September, 1970.

2. The parties stipulated that the issues presented for decision are:

    1. Is it a jurisdictional prerequisite for the prescription of incentive compensation to freight car owners under section 1(14) (2) of the Interstate Commerce Act and sections 553, 556, and 557 of the Administrative Procedure Act, that the Commission grant the affected parties on demand duly made therefor: (a) the opportunity to cross-examine all witnesses of record as well as Commission personnel who conducted the 1968 Freight Car Study, which underlies the rule proposed and adopted by the Commission, and (b) thereafter the opportunity to offer rebuttal evidence and brief or argument.

    2. Whether the Commission acted arbitrarily and unreasonably in denying an oral hearing after issuance of its order on January 14, 1969.

    3. Whether the Commission adequately summarized the data collected in the 1968 Freight Car Study for the use of the parties to the proceeding prior to relying on the Study in the decision of the case.

immediate action exists in any section of the country * * * either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report" to take various steps designed to alleviate or end the crisis.

In utilizing the power conferred by § 1(14) to fix compensation by one railroad for use of the cars of another, the Commission had considered, at least since Judge Prettyman's characteristically able opinion for a three-judge court in Palmer v. United States, 75 F.Supp. 63 (D.D.C. 1947), that it could not include in per diem charges any amount designed solely to stimulate the early return of freight cars but was limited to fixing fair compensation in the public utility sense. Despite increases in the amount of such payments[3] and the Commission's use of its emergency powers under § 1(15), car shortages have become an increasingly serious problem. As stated by the Senate Committee on Commerce in 1966, in recommending the amendment of § 1(14) with which we are here concerned, "Car shortages, which once were confined to the Midwest during harvest seasons, have become increasingly more frequent, more severe, and nationwide in scope as the national freight car supply has plummeted" S.Rep. No. 386, 89th Cong., 1st Sess., pp. 1–2; see also H.Rep. No. 1183, 89th Cong., 1st Sess. To help the Commission deal with car shortages more effectively Congress added to what had become § 1(14) (a) the following two sentences:

In fixing such compensation to be paid for the use of any type of freight car, the Commission shall give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car supply, and shall, on the basis of such consideration, determine whether compensation should be computed solely on the basis of elements of ownership expense involved in owning and maintaining such type of freight car, including a fair return on value, or whether such compensation should be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense. The Commission shall not make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate and may exempt from the compensation to be paid by any group of carriers such incentive element or elements if the Commission finds it to be in the national interest.

Pursuant to this new authority, the Commission, on June 23, 1966, instituted an investigation, Ex parte No. 252, Incentive Per Diem Charges, see 31 Fed. Reg. 9240, "to determine whether information presently available warranted the establishment of an incentive element increase, on an interim basis, to apply pending further study and investigation," 332 I.C.C. 11, 12 (1967). Representations were received from many railroads, the Commission's Bureau of Enforcement, and other interested parties, and hearings for the examination of witnesses were conducted. The Commission rendered a decision in October, 1967, 332 I.C.C. 11. The agency thought it to be "of the most utmost importance"

---

3. The Commission's latest pronouncement on this subject is Chicago, B. & Q. Railway v. New York, Susquehanna & Western Railroad, 332 I.C.C. 176 (1968), sustained in Union Pacific Railroad v. United States, 300 F.Supp. 318 (D.Nebraska), and Boston & Maine Railroad v. United States, 297 F.Supp. 615 (D.Mass.), aff'd per curiam, 396 U.S. 27, 90 S.Ct. 196, 24 L.Ed.2d 142 (1969). The Commission proceeding consumed 15 years!

that before imposing incentive per diem charges "little, if any, doubt exist as to its necessity and effectiveness," 332 I.C. C. at 13–14. It considered the available information, consisting of reports summarizing shortages and surpluses for each carrier,—the type of reports regularly made by Class I carriers to the Association of American Railroads—"insufficient to support any valid conclusions in this case," 332 I.C.C. at 17. While discontinuing the proceeding, it announced that it was embarking "on an investigatory-research program which will use sampling procedures developed and administered by our staff to provide current data on valid car orders and the available supply of operative cars to meet actual needs" and other studies relevant to the discharge of its duties under the 1966 amendment. Two Commissioners dissented, arguing in effect that the agency should not defer action that was plainly needed in a quest for a degree of certainty whose attainment, if possible at all, would take much time.[4]

In December, 1967, the Commission initiated the rule-making proceeding that gave rise to the order here under review, 32 Fed.Reg. 20987. It directed 72 Class I and 63 Class II line-haul railroads to compile and report detailed information with respect to freight car demand and supply at 2641 sample stations for selected days of the week during 12 four-week periods beginning January 29, 1968. The proceeding was "assigned for hearing" at the Washington office of the Commission "on a date hereafter to be fixed;" consideration would be given to requests for hearings at other places.

In response to petitions filed by ten railroads (including the Long Island) early in 1968 for clarification of the order initiating the proceeding and for a pre-study conference, the staff conducted such a conference on April 23, which counsel for the Long Island at-

tended. There was an extensive agenda, including several items relating to the disclosure of staff work papers and data obtained in the study. A detailed report of the results of the conference was sent to all parties. The Commission kept close watch over the data being supplied and, on July 22, 1968, called the railroads' attention to some instances of improper reporting although these were regarded as "rare" and "minor." Also, on January 24, 1969, it issued a further order indicating that as a result of the processing and a preliminary analysis of the accumulated data, "certain revisions and refinements" appeared desirable. The Commission sought the views of the parties about the revisions and suggested that any party disagreeing with the need for the further study should submit "its alternate suggestions, if any, as well as any suggestions as to additional studies which are deemed necessary to supplement those which are involved here." Various parties responded; the Long Island thought the proposed new study would be "useless and ridiculous" and a "waste of time and money on a wild goose chase." The proposed new study was not further pursued.

The Chairman of the Commission, another Commissioner who had dissented from the discontinuance of the 1967 proceeding, and members of the agency's staff appeared at a hearing before the Sub-committee on Surface Transportation of the Senate Committee on Commerce on May 13, 1969. See 91st Cong. 1st Sess., Serial No. 91–8. They presented a staff "Report of the Results of Freight Car Study in Ex Parte No. 252 (Sub No. 1)." This included a narrative summary and analysis, a set of five tables of data, and a justification of the statistical reliability of the underlying information. The Chairman announced the Commission's intention to give the study "to the railroads in the very near future," *id.* at 4, and then to proceed to

---

4. The dissents remind the writer of his comment in 1960, that "the agencies have gone overboard in their zeal for a record that will drain the last dregs from the cask

—and sometimes a good many staves as well." A Look at the Federal Administrative Agencies, in Benchmarks 65, 72 (1967).

have "the validity of the study's conclusions * * * tested against other evidence" to be received "in the hearings which must be held before any incentive per diem rates can be established."

To say that the presentation was not received with enthusiasm would be a considerable understatement. Senators voiced displeasure at the Commission's long delay in taking action under the 1966 amendment, engaged in some merriment over what was regarded as an unintelligible discussion of methodology, *id.* at 119, and expressed doubt about the need for a hearing, *id.* at 116–17 (Senator Hartke), 119, 130 (Senator Magnuson). But the Commission's general counsel insisted that a hearing was needed, *id.* at 117, 119, and the Chairman of the Commission agreed, *id.* at 127.

The expressed intention to make the staff report available to the railroads shortly after the Sub-committee hearings was not carried out as such, although counsel for the intervenor obtained a copy and counsel for the Long Island acknowledges seeing the tables in the spring of 1969. The principal reason for this, apparently, was not any desire for secrecy but rather that the tables in this report assembled the data only for the first six and second six periods (as well as for the full year), a division which, it was concluded, was not sufficiently refined. In any event seven months later, in December 1969, an Interim Report of the Commission was released.

In the Report the Commission announced its tentative conclusion to adopt an incentive per diem charge for standard boxcars only. This was to be payable only during the six months period from September 1 to the end of February. Since the incentive charge was to produce an additional 6% return over and above the 6% already fixed as fair compensation, the incentive payment during the six months was to be at the rate of 12% on depreciated cost. "Net incentive balances" were to be set aside in a reserve earmarked for the purchase of general service, unequipped boxcars in addition to normal replacements. The Interim Report included a sixteen page description of "The Railroad Freight Car Study" and nine pages of data and graphs drawn from it. In some respects the material was more and in other respects less detailed than the document presented to the Senate Subcommittee, to which reference was made. Attached to all this were a proposed rule embodying the Commission's tentative conclusions and an order directing that "verified statements of facts, briefs and statements of position" should be filed on or before February 24, 1970, and replies a month later, and "that any party requesting oral hearing shall set forth with specificity the need therefor and the evidence to be adduced." One Commissioner thought oral hearing was required.

Nine railroads including the Long Island sought an oral hearing. The Long Island's request, made in the form of a motion for modification of the Interim Order, contended that the Administrative Procedure Act, 5 U.S.C. §§ 556 and 557, guaranteed this as a matter of right and alleged compendiously that it was impossible for the carrier "to file a meaningful brief as a party respondent to this proceeding until it has had an opportunity to see the evidence it is being confronted with, crossexamine the proponents' witnesses and rebut such evidence as it deems appropriate." In April 1970 the Commission entered a decision without having accorded an oral hearing. On that issue it found, referring to the APA:

No party has been prejudiced by the submission here of all the evidence in written form; and the verified statements and the replies thereto received by this agency accord the parties a hearing under section 556 of that act.[5]

---

5. At another place in its report the Commission said:

In the absence of any specific showing of prejudice, and in the interest of tak-

On the merits, after considering the comments that had been received, including the Long Island's request for an exemption of "all the predominantly terminating railroads of the northeast section of the nation," it adhered to the tentative conclusions of the Interim Report, with certain modifications not here material. It reiterated that the proceeding was "open-end"; that its studies concerning freight car shortage were continuing; and that "hearings or further proceedings may be necessary later as experience is gained under the incentive plan."

■ The Long Island properly concedes "that the setting of rates for future application, including compensation to be paid by railroads for the use of freight cars not owned by them, is within the meaning of the terms 'rule' and 'rulemaking' as defined by subparagraphs (4) and (5) of Section 551 of the APA." Thus the Commission was obliged to proceed in accordance with § 553(c):

> After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

The Long Island seeks to avoid the effect of the first sentence of this subsection, which would foreclose its claim to an oral hearing, by invoking the last. Sections 556 and 557, there referred to, prescribe procedures for hearings "required by section 553 [rulemaking] or 554 [adjudication] of this title to be conducted in accordance with this section" and provide that

> A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. * * *

5 U.S.C. § 556(d).

The occasion for enacting the third sentence of § 553(c) is clearer than its meaning. When Congress adopted the rulemaking provision of the APA, it was obliged to take into account that in many regulatory statutes it had prescribed a "hearing" in cases of "legislative" action where due process would not require one of the traditional trial type. Congress could have provided in the APA that, despite such prior action, only "rulemaking" procedures would henceforth be required when the agency was making rules. It could have provided on the other hand that whenever a particular regulatory statute required a hearing, one of the trial type must be had even though the matter under consideration was a proposed rule. Instead it directed a trial-type hearing in the case of rules "required by the statute to be made *on the record* after opportunity for agency hearing" (emphasis supplied).

At the time only a few federal regulatory statutes used the italicized phrase or an equivalent. The statute generally referred to as somewhat of a horrible example in this respect, see 1 Davis, Administrative Law Treatise, § 6.06, at 381–82 (1958), is the regulations provision of the FDA, 21 U.S.C. § 371(e) (3). Another, adopted subsequent to the APA and parroting the language of the last sentence of § 553(c), is the Fulbright Amendment of the Walsh-Healey Act, 41 U.S.C. § 43a, see Wirtz v. Baldor Elec. Co., 119 U.S.App.D.C. 122, 337 F.2d 518 (1964). The Attorney General's Manual on the Administrative Procedure Act, p.

---

ing timely and needed action in this area of serious regulatory concern, the requests for oral hearing, cross-examination, and argument are hereby denied.

They too may be renewed at a later date as experience is obtained with the incentive charges.

34 (1947), summarized what it termed "persuasive legislative history to the effect that Congress did not intend sections 7 and 8 [now 5 U.S.C. §§ 556 and 557] to apply to rule making where the substantive statute merely required a hearing." On the other hand, whatever Congress may have meant by a phrase carrying the mind back to the use of certiorari by the 17th century King's Bench, see Wade, Administrative Law 116–18 (2d ed. 1967), it is rather hard to believe that the last sentence of § 553 (c) was directed only to the few legislative sports where the words "on the record" or their equivalent had found their way into the statute book. Thus the Manual states, somewhat inconsistently with the passage just quoted, that "where rates or prices are established by an agency after a hearing required by the statute, the agencies themselves and the courts have long assumed that the agency's action must be based upon the evidence adduced at the hearing," and, in consequence, that Interstate Commerce Commission orders "which are issued after a hearing required by statute, and which are reviewable under the Urgent Deficiencies Act on the basis of the evidence adduced at the agency hearing, must be regarded as 'required by statute to be made on the record after opportunity for an agency hearing.'" Id. at 33–34.

The trend of judicial decision has been to extend the agencies' powers to handle their problems by rulemaking. Two decisions of the Supreme Court have held that the statutory requirement for a hearing does not preclude an agency "from particularizing standards through the rule-making process and barring at the threshold those who neither measure up to them nor show reasons why in the public interest the rule should be waived." F. P. C. v. Texaco, Inc., 377 U.S. 33, 39, 84 S.Ct. 1105, 1109, 12 L.Ed. 2d 112 (1964), thus explaining United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). Siegel v. Atomic Energy Comm'n, 130 U.S.App.D.C. 307, 400 F.2d

778, 781–786 (1968), held that the last sentence of § 553(c) does not require adjudicative procedures with respect to the adoption of a rule excluding a certain topic from investigation in a licensing proceeding, despite a statutory requirement of a hearing "in any proceeding * * * for the granting * * * of any license or construction permit * * * and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees * * *." Courts of appeals have held that the "argument-type" hearing provided by the first sentence of § 553(c) was sufficient in respect of rules, made pursuant to general rulemaking powers, which modified all existing licenses although the regulatory statute required a hearing, presumably of the trial type, for the modification of an individual license on the basis of facts peculiar to the licensee. Air Line Pilots Ass'n, Int'l v. Quesada, 276 F.2d 892 (2 Cir. 1960), cert. denied, 366 U.S. 962, 81 S.Ct. 1923, 6 L.Ed.2d 1254 (1961); American Airlines, Inc. v. C. A. B., 123 U.S.App.D.C. 310, 359 F.2d 624, 628–629 (in banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966); California Citizens Band Ass'n v. United States, 375 F.2d 43 (9 Cir.), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967); WBEN, Inc. v. United States, 396 F.2d 601, 617–619 (2 Cir.), cert. denied, King's Garden, Inc. v. F. C. C., 393 U.S. 914, 89 S.Ct. 238, 21 L.Ed.2d 200 (1968). However, in these cases, as well as in George A. Rheman Company v. United States, 133 F.Supp. 668 (E.D. Carolina, 1955), and Tidewater Express Lines, Inc. v. United States, 281 F.Supp. 995 (D.Md.1968), upholding the Commission's power to define the commercial zone of a city under the exemptive provision of the Motor Carrier Act, 49 U.S.C. § 303(b) (8), by rulemaking proceedings, the agency was purporting to act under a section of the regulatory statute empowering it to make rules without a hearing. The question thus was whether such a grant overrode a requirement for hearings in individual

cases, and the issue whether even if "rulemaking" was appropriate, the last sentence of § 553(c) did not require compliance with § 556 was not presented.

█ Without in any way disagreeing with these decisions, we uphold the Long Island's contention that the third sentence of § 553(c) was applicable. We do not have here a case where an agency is utilizing a general rulemaking power—as to which indeed Title I of this oldest of federal regulatory statutes is notably vague—in order to avoid the need for multiplicitous individual proceedings; the Commission was implementing a statutory direction for fixing future payments which almost necessarily contemplated action on something other than an individual basis. It is true that for that very reason Congress by appropriate language could have empowered the Commission to do this by rulemaking without an adjudicatory hearing. See WBEN, Inc. v. United States, *supra*, 396 F.2d at 618. Instead Congress attached the Commission's authority to include an incentive element in per diem to a 1917 statute which required a "hearing."

However broad the meaning of "hearing" has now come to be, see 1 Davis, Administrative Law Treatise, § 6.05 (1958), we entertain no doubt that the 1917 Congress thought that, even in a context where the Commission would be prescribing only with respect to future payments, that term meant what the Supreme Court had said in I. C. C. v. Louisville & Nashville Railroad, 227 U.S. 88, 93, 33 S.Ct. 185, 187, 57 L.Ed. 431 (1913), namely a proceeding in which "all parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal," [6]—in other words a hearing "on the record." The Commission does not deny that it had always proceeded in this manner in administering § 1(14) before the 1966 amendment, see, e. g., Increased Per Diem Charge on Freight Cars, 268 I.C.C. 659 (1947); Chicago, Burlington & Quincy Railroad v. New York Susquehanna & Western Railroad, 297 I.C.C. 291 (1955), 332 I.C.C. 176 (1968); Investigation of Adequacy of Railroad Freight Car Ownership, Docket No. Ex parte 241, 335 I.C.C. 264 (1969). Contrast Siegel v. Atomic Energy Comm'n, *supra*, 400 F.2d at 785–786. When the Commission sought the additional authority conferred by Congress in 1966, it emphasized that § 1(14) provided for hearings which, as its Chairman stated, "would be necessary in any event to determine among other things, deficiencies by type of cars and by carriers, and the most equitable means of correcting the deficiencies." Hearings before House Committee on Interstate and Foreign Commerce, 89th Cong., 1st Sess., Ser. 89–26, at p. 45 (1965); Hearings before Freight Car Shortage Subcommittee of the Senate Committee on Commerce, 89th Cong., 1st Sess., Ser. 89–23, at pp. 14–15 (1966). The Commission conducted evidentiary hearings in the abortive 1967 incentive compensation proceeding, 332 I.C.C. 11, and intended to do so in this one, as its order initiating the proceeding and its statements to the Senate Subcommittee made clear. Moreover, the Commission's reference to § 556 in the statement from its April

---

6. This view is reinforced by the contrast, frequently encountered in the Interstate Commerce Act, between what the Commission may do only "after hearing," the words used in § 1(14) (a), and what it may do with something less, e. g., § 1(15). In this respect the case before us is somewhat the converse of Seatrain Lines, Inc. v. United States, 168 F.Supp. 819, 825–826 (S.D.N.Y.1958), which held that the first sentence of § 553 of the APA controlled under § 4(1) of the Interstate Commerce Act, authorizing the Commission "after investigation" to allow a carrier "in special cases" to charge less for a longer than for a shorter distance, in part because of the contrast between this language in § 4(1) and that in § 4 (2), providing that a rail carrier which had reduced rates to meet water competition could not increase them "unless after hearing by the Commission it shall be found that such proposed increase rests upon changed conditions other than the elimination of water competition."

1970 Report quoted above seems to assume that the last sentence of § 553(c) applies. In all these respects the case differs from Joseph E. Seagram & Sons Inc. v. Dillon, 120 U.S.App.D.C. 112, 344 F.2d 497, 499 n. 3 (1965), where a requirement that the Secretary of the Treasury give an "opportunity for hearing" before prescribing regulations under 27 U.S.C. § 205 was held not to demand adjudicatory procedures.

■■ However, our agreement with the Long Island that the third sentence of 5 U.S.C. § 553(c) was applicable does not conclude the case in its favor. What Congress gave by that provision of the APA, it partially took away by another. The final sentence of § 556(d) provides:

> In rule making or determining claims for money or benefits or applications for initial licenses an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.

Congress thus determined that even when rulemaking had to be done by a hearing "on the record," the record did not always have to be made in the traditional manner.[7] The Interim Report indicated the Commission's intention to rely on this provision, and it is no matter that the agency initially planned to do otherwise or that its decision to adopt a more expeditious procedure may have been prompted by Senatorial spurs. The

sole question for us is whether the statutory conditions were met.

The Long Island contends that the evidence on which the Commission relied was never "submitted," as § 566(d) requires. It urges that if the Commission wished to dispense with an oral hearing, the agency was obliged to place in evidence the 32,420 data sheets filed by the carriers and the field and staff audits of these on which the Commission admittedly relied. Conceding that "at first blush, it might seem a futile waste of time and money to remand" to the Commission for this purpose, the Long Island urges that giving the parties a reasonable opportunity to examine and evaluate these materials is demanded by minimum requirements of fair play.

■ We agree it would have been better if the Commission had served upon the carriers a summary of the study more nearly resembling the 106 printed pages of text and tables it had presented to the Senate Subcommittee, revised in whatever manner the agency deemed to be desirable for the purpose in hand.[8] But the Interim Report placed the railroads on notice of the document that had been given to the Senate Subcommittee, most of which the Long Island had in fact seen, and which it would have been a simple matter for any carrier to obtain, and the analysis of the study in the Report was adequate to apprise the carriers of the general results and the con-

---

7. Compare the Commission's "modified procedure" in certain rate cases prescribed in §§ 1.45–1.54 of its General Rules of Practice, discussed in Davis & Randall, Inc. v. United States, 219 F.Supp. 673 (W.D.N.Y.1963).

8. In answer to a question from the bench, the Commission has advised in a supplemental memorandum that the staff did not prepare a subsequent report for the Commission comparable to the report submitted to the Senate Subcommittee. Part of the disparity between the length of the study submitted to the Senate Subcommittee and the summary in the Interim Report is due to the fact that the former included all types of freight cars whereas the latter was limited to unequipped, general service boxcars to which

alone the proposed incentive per diem charges were to apply. However, the study given to the Subcommittee included other information, e. g., tables showing the number of days of delay in filling orders, which might have been useful to the railroads. The Long Island urges in its reply to the Commission's supplemental memorandum that further examination of the data might have shown a correlation between over-orders and long delays in filling orders and that the Commission's conclusion that "no such correlation is possible on the present record" simply reflects the agency's refusal to accord a fair hearing. But this issue had always been present and, as developed below, the Long Island could readily have obtained whatever additional data it needed for arguing its case.

clusions drawn from them. The data sheets and audits would hardly have been placed in evidence if an oral hearing had been held. Their importance would have lain in possibly disclosing materials useful in cross-examining the staff witnesses or more likely, in view of the rarity of expert concession of error, in developing rebuttal. Whether there was to be an oral hearing or not, the Long Island's first job was to examine the basic data and find this out. Nothing stood in its way. The carriers had been advised at the April 1968 conference that tapes of the reported data could be made available, on request, to the Association of American Railroads; it developed that the cost of such a tape would have been only $37. It appears that on receiving the Interim Report the Long Island did obtain tapes showing what the burden of the proposed order on it would be; it could as well have obtained the rest. It could also have sought access to the audits and to other work papers prepared by the agency's staff as a basis for the summary in the Interim Report.[9] If, on examining the data, the Long Island had pointed to specifics on which it needed to cross-examine or present live rebuttal testimony and the Commission had declined to grant an oral hearing, we would have a different case.

Instead the Long Island's request for an oral hearing was silent as to any respect in which the Commission's disclosure of greater detail or cross-examination of the Commission's staff was needed to enable it to mount a more effective argument against the Commission's proposal. The last sentence of § 556(d) would be deprived of all meaning if this were held sufficient to put the agency on notice that "prejudice" would result from the denial of an oral hearing. Even taking into account the further representations that have been made to us, we fail to see that prejudice has been established.

The short of the matter is that the decision here called for a leap of judgment by the Commission which detailed figures would inform but could not determine. Of course, if there were no car shortages in some regions and simultaneous surpluses elsewhere, there would be no occasion for incentive compensation. No one contested that there were; the dispute was over the degree and the cause. Both these issues were dealt with extensively in the verified statements submitted by the carriers, and we have yet to hear how cross-examination with respect to the statistics or the presentation of oral rather than written testimony would have aided materially in their resolution.[10] When all had been

9. If the Commission had not made these available, as we assume it would, they could have been obtained under 5 U.S.C. § 552(a)(3). Since any such underlying tabulations would be available on discovery in ordinary litigation, they would not fall within the exception of § 552(b)(5). See Bristol-Myers Co. v. FTC, 424 F.2d 935, 939 (D.C.Cir. 1970). Staff memoranda making policy recommendations to the Commission stand differently.

10. The Long Island's own verified statement in opposition to the proposed order was, for the most part, an argument that "the real culprit for violations of car service rules has been the consignee who after unloading a car reloads it with his products and sends it off in an entirely different direction than it came from" and that the grain industry utilizes boxcars for warehousing rather than transportation; the statement also argued for exemption as a terminating road.

While the statement reiterated the demand for oral hearing, it advanced no specifics why this would be helpful.

In its brief to us the Long Island directed attention to the verified statements of Andrew C. Weamer on behalf of Penn Central Transportation Company and its affiliates and of Clifford J. Janis on behalf of Union Pacific Railroad Co. Mr. Weamer's statement conceded that "The study data appears to have been gathered by recognized methods of sampling and statistical techniques" but vigorously attacked the validity of the conclusions drawn. It did not suggest any need for cross-examining the Commission's staff as to the accuracy of the data or for the presentation of "live" rebuttal testimony. Mr. Janis' statement relied on the fact that in proposing a new study for 1969–70 the Bureau of Enforcement had admitted that some of the questions in the 1968 study invited "judgment determinations by personnel assembling data"; he also point-

said, the serious questions remaining for the Commission were whether some form of incentive compensation would, in the words of the statute, "contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense," and, if so, what the form should be. Even the first question is by no means so easy of solution as the mere combination of shortages in some regions and concurrent surpluses in others might suggest. Whether the Commission provided right, or even rational, answers to these difficult questions is not before us in light of the stipulation of the parties limiting the issues, see fn. 2. Our sole task is to determine whether under all the circumstances the denial of an oral hearing significantly prevented the Long Island from fairly presenting its case. We have found no sufficient reasons to return an affirmative response.

The clerk is directed to enter judgment dismissing the complaint.

ed to some instances in which the 1968 study had rejected data "due to high variability in the estimate using the data with substitution of days." While Mr. Janis thus concluded "that the 1968 study cannot conclusively show that there is a shortage of plain boxcars," he indicated no respect in which cross-examination of the Commission's staff would be helpful and went on to argue that, instead of the proposed incentive *per diem*, the Commission could better promote the purchase of boxcars by a basic *per diem* that would take account of the effects of inflation on the investment. Whatever the force of this argument, nothing would be gained by its presentation as oral testimony.