**GENERAL MILLS, INC., et al., Plaintiffs,**

**New Orleans Traffic and Transportation Bureau et al., Intervening Plaintiffs,**

**v.**

**UNITED STATES of America, and Interstate Commerce Commission, Defendants,**

**The Atchison, Topeka and Santa Fe Railway Company, et al., Intervening Defendants.**

**No. 4–72 Civ. 164.**

United States District Court, D. Minnesota, Fourth Division.

June 12, 1973.

Elmer H. Atchley, and James Scoggin, Minneapolis, Minn., for plaintiffs.

John F. Donelan, John M. Cleary, and Frederic L. Wood, Washington, D.C., Louis A. Schwartz and Laurence F. Daspit, New Orleans, La., and Harold E. Spencer, Chicago, Ill., for plaintiffs-intervenors.

John H. D. Wigger, Dept. of Justice, Washington, D.C., Robert G. Renner, Minneapolis, Minn., Fritz R. Kahn and Raymond M. Zimmet, Interstate Commerce Commission, Washington, D.C., for defendants.

Curtis H. Berg, St. Paul, Minn., William Moloney and Hollis Duensing, Washington, D.C., J. R. Davis, Richmond, Va., James L. Howe, III, Washington, D. C., Harvey Huston, Rodger K. Johnson, Chicago, Ill., Richard Kienle, Roanoke, Va., Richard Murphy, Philadelphia, Pa., and John Paylor, Baltimore, Md., for defendants-intervenors.

Before HEANEY, Circuit Judge, DEVITT, Chief District Judge, and LORD, District Judge.

MILES W. LORD, District Judge.

In this action, plaintiffs seek to set aside in part an Order of the Interstate Commerce Commission approving increases in demurrage charges as proposed by the nation's railroads for the undue detention of freight cars being loaded or unloaded by shippers or consignees (hereafter shippers). In the proceedings entitled Demurrage Rules and Charges, Nationwide, 340 I.C.C. 83, decided October 5, 1971, the Commission found the proposed increased demurrage charges to be just and reasonable and otherwise lawful. It is the plaintiffs' claim that the conclusions of the Commission were not reasonable and not based on substantial evidence and hence should be set aside by this Court.

This action was brought pursuant to 28 U.S.C. §§ 1336, 1398, 2321, 2322, 2323, 2324; 49 U.S.C. § 17; and 5 U.S. C. § 551 et seq. A three judge court was convened pursuant to 28 U.S.C. §§ 2284 and 2325.

By schedules filed with the Interstate Commerce Commission (hereafter Com-

mission), the nation's railroads proposed changes in car demurrage rules and charges governing the detention of railroad cars by or for shippers. The schedules were to go into effect on September 1, 1970 and increased the charges as is illustrated in the following chart:

| Car-days after 48 hours free time | Prior Charges | Increased Charges |
|---|---|---|
| 1 | $ 5 | $10 |
| 2 | 5 | 10 |
| 3 | 5 | 10 |
| 4 | 5 | 10 |
| 5 | 10 | 20 |
| 6 | 10 | 20 |
| 7 | 10 | 30 |
| 8 | 10 | 30 |
| 9 or over | 15 | 30 |

Numerous shippers, including the plaintiffs herein, protested the proposed increases. In response to the protests, the Commission, by Order of Divison 2, suspended the proposal until March 31, 1971 and instituted an investigation into the reasonableness and lawfulness of the suspended schedules. Evidence in written form was submitted by the railroads in support of the proposed changes and by the protesting shippers in opposition thereto. Oral hearings were held before a Hearing Examiner of the Commission for the purpose of cross-examination on December 14–18, 1970.

In a report and order dated March 25, 1971, Division 2 found that the proposed increased charges and rules had not been shown to be just and reasonable, and ordered their cancellation on or before April 30, 1971. At the same time, the Commission announced that it had determined that the proceeding involved an issue of general transportation importance and that parties of record dissatisfied with the decision would be permitted to file a petition for reconsideration by the entire Commission. Such a petition was filed by the railroads on April 28, 1971, and certain of the protesting shippers filed replies. The entire eleven-man Commission issued its report and order on October 5, 1971, which is the order under attack in this proceeding.

Specifically, the Commission found that there has been a substantial increase in the percentage of cars detained by shippers; that the increasing delays in releasing cars are primarily the fault of the shippers; that the demurrage charges established in 1964 had lost their penalty element in the economy by 1971; and that the higher demurrage charges were just and reasonable and would result in a more prompt release of cars by shippers which would be of benefit to the entire shipping public and carriers. The Commission did find that with respect to Saturdays, Sundays, and holidays, the proposed changes were not shown to be just and reasonable and should not be implemented.

A petition for reconsideration was filed and denied by order of the Commission on January 14, 1972. The increased demurrage charges here in issue became effective at the expiration of the suspension period on April 1, 1971 and have remained in effect since that date.

In arriving at their decision, the Commission considered the rising costs of operating railroads as well as specific studies that indicated that the percentage of freight cars held beyond the 48 hour free time has been increasing at a rapid rate. Furthermore, the Commission looked to two specific time periods in the past decade in which the Commission temporarily raised the demurrage rates. The studies reveal that each time demurrage charges were raised, there was a noticeable effect on the detention of freight cars.

The Commission relied heavily on a study of demurrage made by the Association of American Railroads covering the years 1961 to 1970. This study consisted of weekly reports from 13 selected districts indicating the total number of freight cars on hand for unloading and those on hand beyond the 48 hour free time. This study revealed a steady increase over the past decade in the percentage of cars that were detained be-

yond the 48 hour free time.[1] The Commission then looked to its experience during those periods of time when demurrage charges were increased.

Under Service Order 979 which was in effect from April, 1966 until July of 1967, demurrage charges were increased to the same level as the present changes. Whereas in the ten year period, the percentage of cars held beyond the 48 hour free period had increased from 16.48% to 22.58%, the per cent of increase in detention was only .08 in 1966 and there was no increase in 1967. It was the Commission's conclusion that the increased demurrage charges retarded the increase in freight car detention. Under Service Order 1023 demurrage rates were raised for a four month period in 1969.[2] Various studies by the railroads indicated that detention of freight cars during this four month period was considerably less than for the same period in the preceding and the following years.[3]

Plaintiffs in this matter do not challenge all of the changes in the demurrage rates. Although they do not concede that any of the changes are warranted, they maintain that as a matter of policy they choose only to contest the rate change for the first four days after the 48 hour free time.

It is the plaintiffs' position that there is not substantial evidence in the record to support the findings and conclusions of the Commission. In particular, plaintiffs allege that although there may be evidence that the amount of detention of railroad cars has increased over the last decade there is no evidence to show that the increase is the fault of the shippers. Plaintiffs affirmatively produced a number of witnesses who testified to the effect that car detention is the result of poor and inconsistent railroad service and not the fault of the shippers. Secondly, it is asserted that there is no evidence in the record dealing specifically with the problem of detention of empty freight cars which are held for the purposes of loading, although the increased demurrage rate will be applicable to this type of detention. Finally, it is argued by the intervenor port authorities that the situation at the Gulf ports presents a unique problem in that the shippers have no control over the detention of the cars. It is the intervening plaintiffs' position that since there was no specific evidence concerning the situation at the ports and that the Commission failed to make a specific finding relative to this problem that as to the ports, the increased demurrage should be set aside in that it was not based on substantial evidence.

1. CARS HELD FOR UNLOADING, NUMBER AND PERCENTAGE HELD BEYOND 48 HOURS FOR YEARS SHOWN *

| YEAR | CARS ON HAND FOR UNLOADING | CARS ON HAND OVER 48 HOURS | PERCENTAGE |
|---|---|---|---|
| 1961 | 5,083,097 | 837,879 | 16.48 |
| 1962 | 5,811,631 | 982,803 | 16.91 |
| 1963 | 5,225,202 | 939,891 | 17.99 |
| 1964 | 5,241,659 | 984,402 | 18.78 |
| 1965 | 5,047,715 | 976,387 | 19.34 |
| 1966 | 4,866,055 | 945,223 | 19.42 |
| 1967 | 4,560,932 | 885,868 | 19.42 |
| 1968 | 4,609,431 | 985,976 | 21.39 |
| 1969 | 4,615,005 | 1,005,782 | 21.79 |
| Jan.–June 1970 | 2,237,626 | 505,244 | 22.58 |

2. The rates were not raised for the time period contested in the instant suit.

3. Studies were conducted by the Penn Central Transportation Company and the Baltimore & Ohio Railroad as well as the Southeastern Demurrage and Storage Bureau which covered 34 railroads in the southeastern United States.

The main thrust of the shippers' argument centered around the claim that the undue detention was the result of erratic railroad service and not the fault of the shippers. It was the shippers' claim that instead of delivering the cars at a continuous steady rate as ordered, they were often delivered in bunches which made it impossible for the shippers to service all of the cars promptly. To charge the shippers demurrage charges in such an instance would naturally be unfair. However, the Commission rejected the shippers' contentions and specifically found that the increasing delay in the release of freight cars was primarily the fault of the shippers. The Commission stated:

> The increased demurrage charges may prove onerous to those who do not release cars in the allotted free time, but that is as it should be. There is no point in providing a penalty unless it be effective. 340 I.C.C. 89.

As for the claim that the detention of freight cars is the result of erratic railroad service, the Commission concluded:

> Protestants have shown that the service provided by respondents leaves a lot to be desired and that such service contributes to the loss of car-days, but respondents' poor service has no direct bearing on the detention of cars by shippers. . . . Once a car is released by a shipper, no charges will accrue even if the carrier serving the shipper is negligent in providing switching service for that car. Much has been said about the problem of bunching. Under the straight demurrage plan, relief from such occurrences is available under rule 8, and upon failure to obtain satisfaction from the carrier, an appeal to the Commission will lie. Average agreements are designed to take care of bunching . . . .[4] 340 I.C.C. 89.

█ Historically, carriers have received demurrage charges for undue detention of its equipment. This is considered to be a time honored concept in transportation. See, Iversen v. United States, 63 F.Supp. 1001 (D.D.C.1946), affirmed *per curiam*, 327 U.S. 767, 66 S.Ct. 825, 90 L.Ed. 998 (1946). The purpose for imposing demurrage charges as stated by Mr. Justice Brandeis is to "secure compensation for the use of the car[5] . . . [and] . . . to promote car efficiency by providing a deterrent against undue detention." Turner, Dennis & Lowry Lumber Co. v. Chicago, M. & St. P. Ry., 271 U.S. 259, 262, 46 S.Ct. 530, 531, 70 L.Ed. 934 (1926). Hence the legitimacy of the demurrage system is without question and is not at issue in the instant case. Prior to the changes adopted by the Commission, the shippers paid $5 per day for each of the first four days after the 48 hour free time. The fact that demurrage is charged for this period is not questioned, the issue before the Court goes to the proper amount that should be charged.

█ As the Court has noted before, the scope of review of an order of the ICC is extremely narrow. Twin City Freight, Inc. v. United States, 360 F. Supp. 709 (D.Minn., 1972). As stated in United States v. Pierce Auto Freight Lines, 327 U.S. 515, 546, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946), the function of a reviewing court:

> is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done.

4. The shippers have available two alternative plans and are free to switch from one to the other. Under the straight demurrage plan, a shipper obtains relief from demurrage when the detention results from specified causes beyond his control including those where the railroads are at fault due to slow or irregular service that creates bunching or accumulation of cars. Under the average agreement plan, a monthly record of debits and credits is kept. A credit is obtained when a freight car is released within the first 24 hours. This credit may be used to off-set a debit which is given for detaining a car beyond the 48 hour free time. One debit is collected for the detention of a freight car for each of the first four days after the 48 hour free time.

5. It is the Commission's position that demurrage charges are not to be regarded as a source of revenue for the carrier. 340 I.C.C. 87.

Hence, the inquiry is whether the Commission reached a rational conclusion, based on substantial evidence. United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); Illinois Central R. R. v. Norfolk & Western Ry., 385 U.S. 57, 66, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); Consolo v. Federal Maritime Commission, 383 U.S. 607, 86 S.Ct. 1018, 16 L. Ed.2d 131 (1966).

Looking to the evidence that was before the Commission, it is undisputed that there is a shortage of freight cars available to serve the nation's shippers. See, United States v. Allegheny-Ludlum Steel Corp., *supra,* and Investigation of Adequacy of Freight Car Ownership, 335 I.C.C. 264 (1969). In an effort to alleviate the crisis, the Commission has taken positive action on a number of related fronts. In addition to the increased demurrage rates, the Commission has established a new schedule of payment for the use by one railroad of another's cars;[6] added an incentive element to the basic per diem charge to encourage the prompt return of equipment found to be in short supply;[7] enforced the requirement that there by complete unloading of boxcars, free of debris and dunnage, to permit more prompt reuse of the cars;[8] increased the use of its emergency power to remedy critical equipment shortages;[9] and made mandatory certain car service rules which require that empty freight cars be returned in the direction of the railroads owning the cars.[10] In addition, the Commission has endorsed certain legislation aimed at this problem.[11] By improving the railroad service and increasing the incentive to shippers to release freight cars more rapidly, the Commission is attempting to deal with the problem of freight car shortage.

As part of the effort to eliminate the freight car shortage, the Commission has imposed the increase in demurrage rates in an attempt to encourage shippers to release freight cars at an earlier date. There is competent evidence to show that in the past when demurrage rates have been increased, undue detention of freight cars has declined. This would indicate that the shippers have some control over freight car detention. The rate increase is geared at providing an economic incentive to encourage shippers to exercise this control to see that freight cars are released as soon as possible. If the demurrage rates are too low, there may be little or no economic incentive to act expeditiously which may result in the unnecessary detention of freight cars and add to the present shortage of freight cars. Due to the steady increase in the detention of railroad cars, it was rational to conclude that existing demurrage rates were too low and had lost their penalty element. In light of the declining value of the dollar and the corresponding increase in the operating expenses of the railroads, the increase in demurrage rates appears to be quite reasonable.

Plaintiffs assert that the studies relied upon by the Commission were

6. Chicago, B. & O. R.R. v. New York, S. & W. R.R., 332 I.C.C. 176, sustained on review sub nom., Union Pac. R.R. v. United States, 300 F.Supp. 318 (D.Neb.1969), and Boston & M. R.R. v. United States, 297 F.Supp. 615 (D.Mass.1969), affirmed *per curiam,* 396 U.S. 27, 90 S.Ct. 196, 24 L.Ed.2d 142 (1969).

7. Incentive Per Diem Charges—1968, 337 I.C.C. 183 and 217, sustained on review sub nom., Long Island R.R. v. United States, 318 F.Supp. 490 (E.D.N.Y.1970), reversed and remanded in Florida East Coast Ry. v. United States, 322 F.Supp. 725 (M.D.Fla. 1971), reversed 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

8. Consignee's Obligation to Unload Rail Cars in Compliance with Carriers' Published Tariffs, 340 I.C.C. 405 (1972).

9. See, *e. g.,* United States v. Southern Ry., 364 F.2d 86 (5th Cir. 1966), cert. denied, 386 U.S. 1031, 87 S.Ct. 1479, 18 L.Ed.2d 592 (1967).

10. Investigation of Adequacy of Freight Car Ownership, 335 I.C.C. 264, sustained on review sub nom., United States v. Allegheny-Ludlum Steel Corp., *supra.*

11. Hearings on S. 1415, S. 1729, S. 1730 and S. 1731 Before the Special Subcomm. on Freight Car Shortage of the Senate Comm. on Commerce, 92nd Cong., 1st Sess. (1971).

faulty and invalid. Looking specifically to the AAR study, it is alleged that the reporting stations were not representative and that the reporting was shoddy and inaccurate. Plaintiffs similarly attack the independent railroad studies, maintaining that they did not accurately reflect the effect of the increased demurrage charges. In this regard, plaintiffs' arguments go to the weight of the evidence before the Commission. The Commission was apprised of the alleged weaknesses in the various studies but nonetheless found that the studies were reliable for the purposes of their decision. The inquiry of this Court is only to determine if the changes are rationally imposed and based on substantial evidence and the Court is not permitted to reweigh the evidence. United States v. Allegheny-Ludlum Steel Corp., *supra*. It is clear that the evidence before the Commission, even detracting all contrary evidence, is substantial and that the imposed changes appear to be rational, based on the record before the Commission.

As for the claim that the ICC did not consider evidence as to the detention of empty cars held for unloading and the detention of freight cars held for exporting,[12] it is important to note that in raising the demurrage rates, the Commission was acting in its legislative capacity and need not consider evidence as to how the rates will be applied in every possible circumstance. It is sufficient if the changes are reasonable and supported by substantial evidence. In Assigned Car Cases, 274 U.S. 564, 47 S. Ct. 727, 71 L.Ed. 1204 (1927), the Supreme Court stated at 583, 47 S.Ct. at 734:

> In the cases cited, the Commission was determining the relative rights of the several carriers in a joint rate. It was making a partition; and it performed a function quasi-judicial in its nature. In the case at bar, the function exercised by the Commission is wholly legislative. Its authority to legislate is limited to establishing a reasonable rule. But in establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. In this connection, the Commission, like other legislators, may reason from the particular to the general.

It is clear that the imposition of the new demurrage charges was based on substantial evidence and was rationally imposed.

The shippers also argue that the Commission erred by basing its decision on matters that were not a part of the administrative record. Specifically, it is claimed that the Commission relied on its report to Congress on March 17, 1971 in which it concluded:

> Inefficient utilization of the cars is made by shippers. Many shippers delay loading and unloading cars, or use such cars for storage. The situation is aggravated in times of threatened shortages when shippers order more than needed.

In its Order of October 5, the Commission stated:

> Although specific studies of the respondents are subject to some infirmities, the evidence overall is convincing that the increasing delays in releasing cars are primarily the fault of the shippers and receivers. Our finding in this regard is consistent with the views expressed in our summary statement on major problem areas relating to freight car shortages which was transmitted by us to the Congress on March 17, 1971. 340 I.C.C. 92.

It is clear from this statement that the Commission made its determination

12. The increase in demurrage rates does not, by its own terms, apply to export traffic. Instead, special tariffs are set up to apply to export traffic. It is true, however, that some of these special tariffs incorporate by reference the rates imposed in this master tariff, and, in that sense, the increases in the master tariff will increase these special tariffs and affect export traffic.

from the evidence in the record and merely referred to the report to Congress in which a similar conclusion was reached.

Accordingly, the order of the Interstate Commerce Commission is affirmed.

It is so ordered.

HEANEY, Circuit Judge (dissenting).

I concur in the opinion only insofar as it approves an increase in demurrage charges for the first, second and third demurrage levels. I would remand the matter to the I.C.C., instructing it to take additional evidence at the earliest possible date to determine whether the increased demurrage charges for the first four detention days after the expiration of free time will, in fact, significantly increase the availability of box cars to shippers. I would require the railroads to account for all sums collected from this date forward for the period in question, and to deposit all funds thus collected in an escrow account. Finally, I would have this Court retain jurisdiction to insure that an expedited appeal could be taken from any new order of the I.C.C.

As I read this record, there is simply no showing that a one hundred per cent increase in demurrage charges for the first four detention days will be likely to increase the availability of box cars to shippers. On the contrary, the evidence indicates that the railroads have a major responsibility for the delays during the four-day detention period.

The decision of the Commission appears to be based on the assumption that if it costs a shipper more to hold a box car, it will release the cars quicker, and that the railroads will promptly make these cars available to shippers who need them. The Commission cites a 1966–1967 railroad-sponsored study as supporting this assumption. The study showed that when demurrage rates for the four-day period were doubled for a two-year period, 19.42% of box cars were retained beyond the free period; but it also showed that when the rates were reduced to the old levels, 21.39% of the box cars were retained beyond the free period. This is hardly a sufficient showing to justify a doubling of demurrage rates. Moreover, the study was based on an inadequate sample. It failed to take into account all relevant factors and failed to show that anyone but the railroads benefited from the increased rates. Most importantly, the study did not show that more box cars were available to shippers as a result of the increase, or that the flow of products from farms and manufacturers to markets improved as a result of the doubled demurrage charge.

The railroads concede that they have not proved that more box cars were available to shippers during the two years that higher demurrage rates were in effect, and that there is no showing that more freight was moved with the available cars. However, they argue that they are in the business of furnishing box cars to shippers, and that if they have more cars available, they will do what is best for their business and make the additional cars promptly available to shippers. There is logic to the argument, but it is based on the premise that all railroads are, in fact, dedicated to providing better service to their shippers. I am unwilling to accept that premise. The facts of the matter are that: (1) some railroads provide erratic and unreliable service and don't seem to be organized to improve that service; (2) some railroads are more interested in abandoning lines than they are in improving service; and (3) some railroads use available funds to diversify into non-railroad operations. To these railroads, the increased demurrage charges may be a windfall.

The I.C.C. should be asked to require the railroads to prove that there has been, and will continue to be, a direct relationship between higher demurrage rates for the four-day period and the number of box cars actually available to shippers at loading and unloading points, and to further establish that the

railroads can and will move the additional box cars promptly after they are loaded or unloaded. Unless we require the I.C.C. to take this kind of hard-nosed approach, the railroads will receive increased revenue, but wheat and corn will continue to rot in the fields, oil and gas will not be delivered to users, merchandise will not be moved to distributors, and our transportation system will continue to deteriorate.

On rehearing, the parties would have had more than two years experience to draw on. See, United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). This experience could be analyzed thoroughly to determine whether the increased demurrage rates for the four-day period have, in fact, made more box cars available to shippers, and whether more freight has been moved in the available cars. If the evidence showed that the increased rates have had and will continue to have these effects, the I.C.C. could make findings which we would be required to approve. If not, the I.C.C. would have to find other ways of ending the "box car shortage."