**FLORIDA EAST COAST RAILWAY COMPANY, a corporation, Florida East Coast Building, St. Augustine, Florida, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**SEABOARD COAST LINE RAILROAD COMPANY, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

Civ. Nos. 70–574, 70–577.

United States District Court,
M. D. Florida,
Jacksonville Division.

Feb. 18, 1971.

Walter G. Arnold, Arnold & Stratford, Jacksonville, Fla., A. Alvis Layne, Kim D. Mann, Washington, D. C., for Florida East Coast Railway.

John S. Cox, Cox, Webb & Swain, Jacksonville, Fla., Richard A. Hollander, Richmond, Va., for Seaboard Coast Line Railroad.

John N. Mitchell, Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Fritz R. Kahn, Gen. Counsel, Leonard S. Goodman, Associate Gen. Counsel, I. C. C., Washington, D. C., John L. Briggs, U. S. Atty., Jacksonville, Fla., for defendants.

Before SIMPSON, Circuit Judge, and McRAE and SCOTT, District Judges.

SIMPSON, Circuit Judge:

These are actions under Title 28, U.S.C. Sections 1336, 1398, 2284 and 2321–2325, to set aside the incentive per diem rates established by the Interstate Commerce Commission (Commission) in its rulemaking proceeding entitled Incentive Per Diem Charges—1968.[1] In this proceeding the Commission issued two formal reports comprising its decision, the interim report of December 12, 1969[2] and the final report of April 28, 1970.[3]

On August 28, 1970, Judge McRae for this three-judge court entered two orders restraining the operation of the Commission orders but only insofar as they affected the two plaintiffs before the court. The temporary restraining orders were amended by order of August 31, 1970, to prevent the plaintiffs from benefitting from the rules and charges during the period they were not required to pay incentives by requiring them to keep records in order to make restitution to other railroads if so ordered by final decision of this court.

The dispute arose against the following background. For a number of years portions of the nation have been plagued with seasonal shortages of freight cars in which to ship goods. The incentive per diems are an attempt by the Commission to alleviate this problem at least in part.

The Commission was first given the power in 1917 to regulate car service and the compensation paid by railroads for the use of cars not owned by the railroad utilizing the car. The current statutory authority for such regulation is embodied in Section 1(14)(a) (49 U.S.C. § 1(14)(a)) of the Interstate Commerce Act:

§ 1, par. (14). Establishment by Commission of rules, etc., as to car service. (a) The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations, or practices.

The Commission also was given the power to meet emergency situations by summary measures without notice or hearing. Title 49, U.S.C., Sec. 1(15). Considering these powers insufficient to meet the continuing crisis in the railroad industry, Congress in 1966 added the following language to Section 1(14)(a) to give the Commission wider discretion in dealing with rail car shortages:

In fixing such compensation to be paid for the use of any type of freight car, the Commission shall give consideration to the national level of ownership of such type of freight car and to oth-

---

1. Ex Parte No. 252 (Sub-No. 1).

2. 337 I.C.C. 183.

3. 337 I.C.C. 217.

er factors affecting the adequacy of the national freight car supply, and shall, on the basis of such consideration, determine whether compensation should be computed on the basis of elements of ownership expense involved in owning and maintaining such type of freight car, including a fair return on value, or whether such compensation should be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense. The Commission shall not make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate and may exempt from the compensation to be paid by any group of carriers such incentive element or elements if the Commission finds it to be in the national interest.

Thereafter the Commission began an investigation, Ex Parte No. 252, Incentive Per Diem Charges, to determine the appropriateness of the establishment of an increased incentive. 332 I.C.C. 11, 12 (1967). In October 1967, the Commission concluded that the information it had accumulated was insufficient to draw any conclusions therefrom, and discontinued the proceeding. In December 1967, the Commission initiated a rule-making procedure requiring the Class I and II railroads to gather and report to the Commission detailed information concerning freight car supply and demand for a specified period. It is clear that at that time further hearings were contemplated prior to the enactment of any new rules. The information submitted by the railroads was analyzed and presented to Congress by the Commission in a "Report of the Results of Freight Car Study in Ex Parte No. 252 (Sub. No. 1)". Members of the Senate Subcommittee on Surface Transportation expressed considerable dissatisfaction with the Commission's apparent inability to take effective steps toward eliminating the national shortage of freight cars. Comments were general that the Commission was conducting too many hearings and taking too little action. Senators pressed for more action and less talk, but Commission counsel expressed doubt respecting the Commission's statutory power to act without additional hearings. Despite Commission counsel's expressed misgivings about straightaway action, the Commission in December 1969 published an Interim Report announcing its tentative conclusions to adopt incentive per diem charges on standard boxcars based on the information compiled by the railroads to be in effect from September 1 to the end of February of each year. Attached to the Report was a proposed rule adopting the Commission's tentative conclusion. The railroads were requested to make statements of position and were informed "that any party requesting oral hearing shall set forth with specificity the need therefor and the evidence to be adduced". Seaboard Coast Line (Seaboard) and Florida East Coast (FEC) requested oral hearings, as did numerous other railroads. In April 1970, however, the Commission entered its order without holding further hearings, finding that the procedure did not prejudice the parties and that further hearings could be held as experience under the incentive plan dictated. These suits followed.

Seaboard, in its attack upon the actions of the Commission, alleges (1) that the Commission failed to afford it a proper hearing and that such failure prejudiced Seaboard, (2) that the Commission failed to comply with the requirements of Section 1(14) (a) of the Act, and (3) that the Report and order of the Commission does not contain reasons and findings sufficient to support the Commission's conclusions. FEC joins in Seaboard's arguments that it was improper for the Commission to act without further hearings and that the Commission's conclusions are not based on substantial evidence, and also adds

the contentions that (1) the Commission's order is so unreasonable as to deny due process and (2) that the Commission should have exempted FEC from incentive per diem payments. Since we find that the Commission acted illegally in denying the plaintiff railroads a hearing before the imposition of the incentive per diem charges, we pretermit discussion of all but the first point.

The parties agree that what is at issue is the question of what degree of procedural due process accompanies a Commission rulemaking proceeding. Section 1 (14) (a) of the Interstate Commerce Act clearly states that the Commission may establish reasonable rules, regulations, and practices with regard to the subjects described therein *after hearing*. Section 1(14) (a), however, is modified by provisions of the Administrative Procedure Act (APA), Title 5, U.S.C. § 551 et seq. Section 553(c) provides "When rules are required by statute to be made on the record after opportunity for an agency hearing, Sections 556 and 557 of this title apply instead of this subsection". The pertinent section to the problem at hand, Section 556(d), provides:

> (d) Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence. A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence. A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. *In rule making or determining claims for money or benefits or applications for initial licenses an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.* (Emphasis added)

The Commission argues that the emphasized portion of the statute allows the procedure utilized by the Commission in this instance, relying primarily upon the able opinion of Judge Friendly for the statutory three-judge district court in Long Island Railroad Company v. United States, 318 F.Supp. 490 (E.D. N.Y., July 22, 1970) involving the same Commission April 1970 order. In *Long Island* the court concluded that the plaintiff railroad had shown no prejudice from the procedures utilized by the Commission, noting that "Long Island's request for an oral hearing was silent as to any respect in which the Commission's disclosure of greater detail or cross-examination of the Commission's staff was needed to enable it to mount a more effective argument against the Commission's proposal". 318 F.Supp. at 499. However, that court expressly limited its holding by warning "If, on examining the data, the Long Island had pointed to specifics on which it needed to cross-examine or present live rebuttal testimony and the Commission had declined to grant an oral hearing, we would have a different case". Op. cit. at 499.

We think that the facts of the instant case fall within the exception expressed in *Long Island,* and demonstrate that the plaintiffs herein were prejudiced by the summary procedures of the Commission. For instance, the Seaboard noted in its statement of position its recent acquisition of large numbers of specialty cars in reliance on the well-established Commission principle that a railroad's primary duty is to provide effective service to the shippers in its area, and pointed out that the sudden emphasis by the Commission on unequipped boxcars to the exclusion of other cars would punish the Seaboard for its reliance. Seaboard questioned the foundation for the board's order, labeling it an experiment the results of which the Commission was unable to predict. Seaboard also contested the "earmarking" aspect of the funds received by each railroad from the operation of the incentive per diems. It

observed that the hasty action of the Commission—decided upon without hearings and with conclusions so admittedly tentative as to give validity to the label "experiment"—would cost Seaboard approximately 1.8 million dollars annually. FEC presents an even stronger case for a hearing. FEC details its status as a terminating line and the asserted strong policy reasons for exemption of FEC from the incentive per diem charges. FEC sought to disclose a number of deficiencies in the Commission's order by presentation of evidence and cross-examination of the employees of the Commission who directed and prepared the studies relied upon in reaching the Commission conclusions. The statements of Seaboard and FEC are attached hereto as Appendix A and B, respectively. Without discussing in detail the grounds there urged as requiring a hearing, we are of the clear view that these assertions demonstrate the prejudice to Seaboard and FEC arising from the Commission's failure to provide hearings.

 The Commission contends that even if the plaintiffs prove all that they seek opportunity to prove, the Commission's order can still be sustained. That argument is wide of the mark. Statutory and constitutional procedural due process does not direct itself to the question of what decision should be reached in any given case, but rather deals with the process of decision making. Numerous decisions made on insufficient records are eventually sustained after being supplemented by further hearings, but that does not negate the right of the parties to be heard. Anyone can make decisions, but strict adherence to cherished procedural rights is necessary to insure that the decisions are informed.

Excerpts from the testimony of the Commission Chairman, Mrs. Brown, in the hearings before the Senate Subcommittee on Surface Transportation of the Committee on Commerce, held May 13, 1969, Serial No. 91–8, and the accompanying statements of Mr. Ginnane, Commission counsel, forecast this litigation and offer insight into the reasons for the action's of the Commission:

Senator Hartke. All right. Let me come straight to the question that I think is paramount. That is the question of legal interpretation of the act itself and the amendments. It is my understanding that the Commission and its legal authorities have taken the position that before any type of basic action can be taken, before any preventive measures can be taken, it must be shown that there is an actual shortage which is determined in accordance with a hearing.

In other words, that you have to establish a shortage by competent testimony and study before you can act even though it is arguable that preventive hearings are not required by the act.

Now, I would like to have a statement as to whether or not I correctly interpreted what the Commission's interpretation of the law is?

Mrs. Brown. I believe you said preventive actions?

Senator Hartke. Yes.

Mrs. Brown. As we have stated, in the statement itself, that a hearing is necessary and I am going to refer the technical legal question to our general counsel, Robert Ginnane, who is seated at the end of the table.

Mr. Ginnane. In answer to your question, Senator, I don't want to be too dogmatic.

Senator Hartke. Lawyers never are, don't worry about that. I am a lawyer myself.

Mr. Ginnane. For this practical reason, I don't know what ultimate action of the Commission I may be defending in the Court and I don't want to say it in words that may be thrown in my face.

The Chairman.[4] Say that again. I didn't hear you.

Mr. Ginnane. I don't want to make a statement here that can be thrown in my face in any later court proceedings.

4. Senator Magnuson, Chairman of the Senate Committee on Commerce.

The Chairman. You mean about box car shortages?

Mr. Ginnane. In terms of the defending—

The Chairman. Excuse me, I don't want to interrupt, but I don't understand your comment.

Mr. Ginnane. I mean in terms of defending any order which the Commission might issue. But I can answer your question to this extent—

The Chairman. If you were in the court whose side would you be on?

Mr. Ginnane. Defending whatever order the Commission issues.

Senator Hartke. Well, I do not think that you have any more responsibility to the Commission than you have to the Congress of the United States. You do not have a responsibility which is more supreme than that owed to the Congress.

After all, the Commission is an arm of the Congress and this is a hearing in front of the Congress. We are not just up here representing our own personal viewpoint.

You are an arm of the Congress, In my opinion, and I say this and don't insist upon it, in my opinion it is your responsibility to give an interpretation of the Act as you understand it and let the chips fall where they may after that.

If the Commission decides to overrule you they had better get a new counsel.

Mr. Ginnane. I think I can be helpful in this way, Senator: As Chairman Brown pointed out, the Commission can fix per diem.

Senator Hartke. That is interpretation; is that right?

Mr. Ginnane. Yes; there must be a hearing. That is in the beginning of section 1(14)4 [(a)] the Commission may, after hearing, on a complaint or upon its own initiative.

Senator Hartke. That is the Commission may, after hearing on a complaint, or upon its own initiative without complaint.

Mr. Ginnane. But in either event only after a hearing.

Senator Hartke. Why?

Mr. Ginnane. Because the Congress has so reported it in the opening clause of section 1(14). The Commission may after a hearing.

Senator Hartke. If you go back to the amendment itself which was enacted in 1966, this amendment was put in there specifically for the purpose of eliminating the very problem that we had. Tell me in that section where you conclude that you must have a hearing, especially in view of your emergency powers under section 1, subsection 15.

Mr. Ginnane. I have to call your attention to the fact that in the emergency powers of section 1, paragraph 15, we can act summarily and without a hearing on every element except the element of compensation to be paid for the use of cars.

That 1(15) goes on to provide that the compensation will be for the use of cars resultant from our exercising powers. If the carriers cannot agree on that compensation, it must be fixed by the Commission after a hearing.

\* \* \* \* \* \*

Mr. Ginnane. Even under 1(15) we can't fix rates of compensation without a hearing.

Senator Hartke. Do you have trouble having a hearing, I mean since 1966? One of the reasons I set the hearing for this date was that I wanted to preclude your coming in with another delay. I wasn't going to wait any longer.

What I am asking you is why didn't you have the hearing? What is there to prevent you, you have this material. Is there any reason? I think that the people who are involved here—you have the shippers, the carriers, and the public all lose money and the report that you have here, which is filed today and I am glad you have it here, indicates that it is a rather substantial loss.

These are losses not alone to those people involved but to the total Nation's economy.

Mrs. Brown. Well, I can simply say, as you know, the study has been pre-

sented to you in the form that it is now and—

Senator Hartke. And it has one of those little hookers on the end of it that the railroads are now going to claim that they want an advisory commission that you are going to come in and recommend an advisory commission and we are going to have this S of S syndrome right back in our face again.

If you raise the basic per diem to $4.50 or $5, would not these cars find their way home very fast? Wagging their tail behind them?

Mrs. Brown. Well, that precisely, I don't know about the amount, but that precisely is the position that the Commission is trying to get itself in which our lawyers have told us there must be a hearing on and at the outside date would be within 3 or 4 months.

It could be even closer than that. In order to have the proper record.

The Chairman. Why do you say there must be a hearing? You have authority, unless I am wrong when I wrote the act, to act on your own initiative without a hearing. I mean it is advisable if you can have a hearing, I understand that, or am I wrong?

Mrs. Brown. Well, I am going to defer to my general counsel again because I am told that you have to have a hearing.

The Chairman. You can issue an emergency order at any time without a hearing. If the act doesn't allow that we are going to change it, I will tell you that. What is the use of having a hearing on these things? I just don't understand. I don't understand what you are doing here. What is this exhibit appendix D? Can anybody understand that?

If C is greater than 1.96, the chances are 95 out of 100 that the difference is significant. If C is greater than 2.58, the chances are 99 out of 100 that the difference is significant. The difference is ratio 1 minus ratio 2. Compute the standard area of the difference and when 2 over 1 is squared with the sampling error, the square of the sampling error is the second ratio and you compute the difference between C and D.

Now, what has that to do with boxcar service?

Mrs. Brown. I am going to defer this question to Mr. Bybee, who heads the staff.

The Chairman. I don't think anybody can understand this thing. I thought the income tax form was bad enough, but this is something else. In other words, let's get down to some basic facts here.

We have been going at this thing how many years? Long before any of you were ever down at the ICC. I hate to repeat this but I am sure that your Chairman will allow me to, the very first meeting of the Commerce Committee I went to 25 years ago, we were discussing boxcar shortages. Twenty-five years ago.

Here we are again with studies C over D and X over C. Now, we know we are going to have a boxcar shortage in the fall.

Isn't there someone of us that can do something about it and if you haven't got enough authority under the law, we will change it for you. You can hold hearings until doomsday on these things. I suspect that we have a storeroom full of hearings on boxcar shortages. We have to move them out to Virginia, to a fieldhouse out there because we can't handle them here, the building isn't big enough.

Now the Department of Transportation is going to study it. In other words, why study boxcar shortages, you have a shortage. You are going to have one with this year's crop. A big one.

What can we do about it, have another study? This, I don't understand.

I will ask a simple question, you can act without a hearing, am I wrong?

Mr. Ginnane. In my opinion the Commission cannot fix compensation without an opportunity for a hearing.

\* \* \* \* \* \*

(Senator Hartke)

How would you change this to do what the Chairman want to do? In other words, he says you can operate without a hearing, what would we have to change?

Mr. Ginnane. To make it clear that you intended us to fix rates for the compensation without a hearing.

The Chairman. That is under emergency matters. I think that is pretty clear, you said you could act on your own initiative.

Mr. Ginnane. As I read it, sir, the Commission may, after a hearing on a complaint or on its own initiative, but after a hearing.

The Chairman. And the purpose of the law was that you could act on it. You can't have feelings on these things, the wheat in Wyoming will be lying on the ground when you start to hold hearings on it. Well, maybe we better amend the law for you to make it clear. Do you want the committee to give you an expression of intent? We can do that pretty fast.

Senator Hartke. I can give you my expression of intent right now.

The Chairman. We want to clear up the freight car shortage. I have been in this 25 years and we haven't done it. Now you come up with some gobbledygook like this. I don't understand it. It is the duty of you people down there to come up with some answers. What can we do?

Senator Hartke. This is why people are betting mad at bureaucrats, if you want to know the truth. I am not against bureaucrats, I just don't like the way they act sometimes. Let's review that, Mr. Counsel.

This is section 1(15). Whenever the Commission is of the opinion that shortage of equipment, congestion of traffic, or other emergencies requiring needed action exist in any section of the country, the Commission shall have and it is hereby given authority either upon complaint or on its own initiative without complaint, at once, if it so orders, without answer or formal proceeding by the interested carrier or carriers or without notice hearing order the making or filing of a report according to, as the Commission may determine, (a) to suspend the operation of all rules, regulations, or practices established for car service until such time determined by the Commission, (b) to make such just and reasonable corrections with respect to car service without regard to the ownership during which such emergency will best promote the interest of the public and the commerce of the people, upon such terms of compensation as the carriers may agree upon or in the event of their disagreement, the Commission may after subsequent hearing find to be just and reasonable.

That is where you hang your hat, upon that portion, is that right?

Mr. Ginnane. That's correct. We can act in terms of controlling the distribution and the use of cause without hearing.

Without question, if the actions of the Commission were in accord with legal and constitutional safeguards the mere fact that Commission counsel initially thought hearings necessary would be irrelevant. Nevertheless our conclusion, reached from an independent study of the record, is fortified by the fact that Commission counsel is clearly on the record before Congress as advising that hearings comprised a necessary step in the promulgation of the rules in issue here today. Counsel correctly prophesied the shape of these proceedings.

The unfortunate aspect of our ruling is that action on rail car shortages, assuming they exist (as we do), are now further delayed to allow additional hearings to be conducted. This result often ensues when administrative agencies, whether from Senatorial pressure or from other cause, attempt procedural shortcuts in decision making. The shortcut frequently turns out to be the longest way home.

It is ordered in accordance with the foregoing that the order of the Interstate Commerce Commission dated April 28, 1970, and styled Ex Parte No. 252 (Sub-No. 1), Incentive Per Diem Charges—1968, is enjoined, annulled and set aside insofar as the same affects the plaintiff railroads in these proceedings and the enforcement of the Commission order is as to said plaintiffs enjoined, annulled and set aside, all without prejudice to further proceedings before and further findings and orders by the Commission not inconsistent with this opinion-order.

## APPENDIX A
### BEFORE THE INTERSTATE COMMERCE COMMISSION

EX PARTE NO. 252 (Sub—No. 1) INCENTIVE PER DIEM CHARGES— 1969

STATEMENT OF POSITION OF SEABOARD COAST LINE RAILROAD COMPANY

Richard A. Hollander
Attorney for Seaboard
Coast Line Railroad Company
Due Date: March 17, 1970

### BEFORE THE INTERSTATE COMMERCE COMMISSION

EX PARTE NO. 252 (Sub–No. 1) INCENTIVE PER DIEM CHARGES—1969

STATEMENT OF POSITION OF SEABOARD COAST LINE RAILROAD COMPANY

The Seaboard Coast Line Railroad Company (SCL) opposes the tentative conclusions reached by the Interstate Commerce Commission in its Interim Report served December 22, 1969.[1]

This proceeding is of great importance to all railroads, including the SCL, yet the Commission has chosen to approach it hastily, without the usual care, consideration and explanation. In doing so, it has left unanswered many questions, and it has left unexplained the reasons for many of its conclusions. It has done these things in spite of its earlier recognition of the probable severe impact of the proceeding, and it has done so in the face of its promise that "this Commission will not risk the stability and effectiveness of the railroad industry by exercising its authority capriciously."[2]

The "solution proposed"[3] was given to us less than three months ago, without hearing, and, since then, the SCL has been diligently conducting its own studies for the purposes of understanding the reasons for the conclusions reached and of measuring the impact of the proposal on its operations. Those studies still are underway, but the due date for statements now is here. The SCL sought more time to measure the new plan, but that opportunity has been denied. Therefore, we are here, before the Commission, without a real chance to present detailed verified statements. That is one of our objections.

There are others. Our studies have progressed far enough to indicate major flaws in the Commission's proposition.

It has become clear, as we look into the Commission's plan, that some of the more progressive roads in the area of car supply, including the SCL, will be penalized for their proficiency. The reason for this conclusion is the fact that the tentative charges are applicable only to standard box cars. They don't apply to specially equipped box cars, and this railroad, being one of the leaders in

---

1. The SCL also has been asked by the Georgia Railroad, the Western Railway of Alabama, the Atlanta and West Point Railroad, and the Chattahoochee Valley Railway Company to represent them here and to express for them the same position taken by the SCL.

2. Incentive Per Diem Charges, 332 I.C.C. 11, 17 (1967)

3. Interim Report, Sheet 14.

tailoring its cars to the needs of the shipping public, now must suffer because it does not own more of the less-desirable plain boxes. Stated succinctly, when the latter type of equipment is on the lines of the SCL, it pays; when the SCL's special, expensive, more-modern box cars are on foreign lines, the SCL does not receive incentive payments. This one-way street approach places a premium on antiquity. Furthermore, it fails to heed the admonition of Section 1(14) (a) of the Interstate Commerce Act that all relevant car supply factors are to be considered.

Assuming, for the moment, that the Commission changes its tentative proposal to cover all types of box cars, or, assuming that a given carrier is a creditor line insofar as plain box cars are concerned, there appears another disturbing feature in the report served last December 22. It relates to "Earmarking of Funds." [4] First of all, the funds are to be tied up until "the carrier has in the same calendar year already built or purchased [or rebuilt] its 1964–1968 average number of such boxcars." Aside from the tying up of funds, what will happen to the dollars if the average is not reached in a given calendar year? Then, and perhaps most important, what possible data does the Commission possess to warrant a conclusion that the earmarked funds should be used to acquire "unequipped boxcars" when experience indicates that shipper needs are ever shifting towards specialized box cars?

This leads the SCL to a most vital objection. Obviously, it, and certain other railroads, are being forced by the Commission into a mold which has been cast to fit carriers with dissimilar transportation requirements. It has become clear from a study of the Interim Report that it was written with a limited type of railroad and certain shippers in mind. It should not have been, for the mandate of Section 1(14) (a) of the Act is

ignored, and the section has been used only as a crutch to prop up limited interests. The incentive charges were not drafted to fit the "national level of ownership." We know that grain shippers have problems, and that, at times, great pressure is put on the Commission to find some way to get them additional unequipped box cars. But, the shipper and carrier interests in the part of the country which the Commission refers to as Zone 3 face in a different direction. As a result, the SCL, confronted by its users with the desire for specialty box cars, now would be required to ignore many of the needs of the Southeast. Prior to this Interim Report the Commission had told us just the opposite; that each railroad should so acquire equipment as to protect traffic originating on its own line.

Several years ago, on April 26, 1962, in Philadelphia, Commissioner Murphy, noting that a shipper should not be made to "fit his products into a few basic types of cars, such as box, gondola, and flat cars," quite properly recognized the need for "cars to meet shippers' specialized needs," and he remarked that "(r)ailroads are realizing the possibilities inherent in specialized equipment for affording more attractive service to shippers." Then, just last year the Commission expressed its thoughts.[5] Speaking of the equipment demands of shippers, Division 3 said:

"The originating carrier is in the best position to know the requirements of its shippers and is in a far better position than another carrier 1,000 or 2,000 miles away to make judgment as to needs of local shippers. Although similar freight cars may be, and are used for many commodities having quite different loading characteristics, the cars that are purchased by any given line are those which will most nearly fulfill the shipping requirements of its patrons. Thus, rail-

4. Interim Report, Sheets 11–12; page 3 of appendix to order.

5. Investigation of Adequacy of Freight Car Ownership, 335 I.C.C. 264, 286, 287 and 290.

roads which load large quantities of grain will tend to own a large number of boxcars with door openings suitable for grain service. Roads which originate large quantities of lumber will tend to own large fleets of 50-foot boxcars with door openings of 14 or 15 feet. Other variations include car width, height, type of lining and capacity, both cubical and weight carrying."

It went on to say:

"One of the basic tenets of car supply, that is, a carrier should protect traffic originating on its own lines, is apparently being ignored. Such a situation we find to be unconscionable and one that must not be continued."

When then-Chairman Webb testified before the Senate's Committee on Commerce on April 7, 1965, with respect to the enactment of Section 1(14) (a), he pointed out that "each railroad should own freight cars of various types which, together with foreign cars used in strict accordance with car service rules, are sufficient in numbers to protect the loadings it originates."

Until the service of the Interim Report last December 22, the SCL had every reason to believe that it could rely upon past Commission-stated objectives and upon its own business requirements with respect to car types. It still believes so, and it should not be forced by the Interim Report into the purchase of standard box cars when its business requirements make the acquisition of other kinds of equipment more desirable.

If we, on the SCL, are going to be asked to disregard our own rail users, at the very least we should know why the Commission has reached that conclusion. And, we don't know. Discussions in the Interim Report with respect to Zone 3 carriers are noticeably missing. This failure to give reasons for the limited applicability of the incentive per diem requirements, without a reasonable opportunity to be heard, does not comport with the requisites of law.

On March 27, 1969, Chairman Stafford, speaking in Minneapolis, said that Section 1(14) (a) "does not automatically place the Commission in a position to prescribe the increased per diem incentives," but that, instead:

"The statute requires a full hearing for determining whether incentive per diem should be imposed."

When he testified in 1965 before the Senate's Committee on Commerce regarding Section 1(14) (a), then-Chairman Webb said the same thing, noting, in addition, that "no sudden change in per diem charges would be effected by the proposed legislation." We believe that the "tentative approach" [6] used by the Commission is too superficial, and that approach, alone, shows why all of the affected parties should be heard.

Without a hearing, and without an adequate discussion of reasons behind basic conclusions, the affected parties run risks such as this. In its Interim Report the Commission expressed a desire to "produce a steady annual, although not perennial, flow of funds to the creditor per diem roads with which they can purchase additional plain boxcars." [7] The SCL has been diligent in acquiring equipment to meet the needs of its shippers, and can be said to be a creditor road, yet the new tentative order will penalize the SCL and will not send to it any "flow of funds." Instead, the SCL's tentative studies show that it will lose in excess of $1.5 million each year as a result of the Commission's "experiment," to the detriment of its car supply program.

Further, with regard to the quotation in the previous paragraph, had there been a hearing in this matter, the parties would, no doubt, have brought attention to this statement of Commission-

---

6. Interim Report, Sheet 6.

7. Interim Report, Sheet 5.

er Webb before the Senate Committee in 1965:

"It should be emphasized that large net per diem debits do not necessarily indicate that the debtors are deficient in car ownership. Some railroads which supply great numbers of cars to the interchange fleet are not per diem debtors. Other railroads terminate so much more traffic than they originate that they would be substantial net per diem debtors, even if they owned more cars than they needed. Conversely, it is conceivable that railroads which consistently show net per diem credits may not own enough freight cars of a particular type. Accordingly, if the proposed legislation were approved, the Commission would exercise *extreme caution* in setting incentive per diem rates. We recognize that an indiscriminate increase in the number of freight cars would result in an uneconomic surplus of cars of various types and would result in wasteful transportation practices."

It is open to serious question whether the Commission's plan for producing "a steady * * * flow of funds to creditor per diem roads" for the purpose of acquiring plain box cars will result in a car supply adequate to meet the needs of commerce. Rather, we think that "extreme caution" should have been utilized here so that the needs of all shippers and all carriers could have been given the necessary consideration.

And the shippers, whose cries have caused such haste here, must play a part in the hearings before more judicious conclusions are reached. For, in considering incentives, what thought has the Commission given to the shipper or consignee whose failure to promptly load, unload, or release cars is a major cause of car supply problems.

There are other problems with the Interim Report to be considered. We point out that there is great danger in engaging in too many assumptions which have not been tested by the parties directly involved. Here we refer to the Commission's "tentative approach to the *appropriate amount* of incentive." [8] The approach simply is not understood by this carrier, and, once again, it appears not to take into consideration the needs of all carriers. Instead, it favors the carriers and shippers whose basic needs are unequipped box cars. It is not enough to say that the approach is "experimental," for this experiment could quickly cause irreparable harm.

In another area of the report, there is no apparent reason to support the conclusion [9] that a "6-month application of the incentive charges should bring distinct economic benefits." The SCL stands to lose a considerable amount of money, and its long-term car supply considerations would be affected adversely by the Commission's short-term experiment. It is very plain to this railroad that someone else will receive the "distinct economic benefits" at our expense, and to the detriment of our car supply program. This result, in turn, will be harmful to many shippers and receivers in the Southeast who appear not to have been considered by the Commission in its Interim Report.

## CONCLUSIONS

The SCL recognizes that there exist many problems with respect to car supply. But, tentative, unreasoned, and unsupported requirements result only in inadequate and inequitable answers to the problem. Experiments are 'dangerous, not only because they can be harmful to the economy of carriers, but because they offer an insecure base upon which to make long-term arrangements and investments in expensive rail cars.

For the reasons stated, therefore, it is the position of the SCL that the "tentative conclusions" of the Commission cannot be supported by facts, that the carriers are entitled by law to a hearing on the vital subject of incentive per diem charges, and that the interim order must

8. Interim Report, sheets 6–10

9. Interim Report, sheet 10.

be set aside until a proper record can be made.

Respectfully submitted,

Richard A. Hollander
Attorney for Seaboard Coast
Line Railroad Company

Dated: March 16, 1970

## APPENDIX B

BEFORE THE INTERSTATE
COMMERCE COMMISSION
Ex Parte No. 252 (Sub No. 1)
INCENTIVE PER DIEM
CHARGES—1969

REPRESENTATIONS OF FLORIDA
EAST COAST RAILWAY
COMPANY
AND
REQUEST FOR ORAL HEARING
AND ORAL ARGUMENT

## I. PRELIMINARY STATEMENT

By interim report and order served December 22, 1969, the Commission issued tentative findings and conclusions regarding the adequacy of plain box cars and the necessity for prescribing an incentive charge to be added to the basic per diem charges paid by railroads for use of plain box cars owned by other roads. The report proposes a schedule of incentive charges applicable to plain box cars during the period September 1 through February 28 of each year. The Commission's order, as amended, directs interested parties to file initial verified statements, briefs, or other responses to the interim report on or before March 17, 1970.

These representations and request for oral hearing and oral argument are submitted on behalf of the Florida East Coast Railway Company (FEC). Attached hereto and submitted on behalf of FEC are verified statements of E. L. Masters, Comptroller-Secretary of FEC, and R. P. Taylor, Assistant to the Vice President of FEC.

## II. SUMMARY OF THE POSITION OF FEC

1. If the Commission decides to impose the proposed incentive charges on plain box cars, FEC should be exempted from payment of the charge because (a) FEC is a terminating railroad, (b) FEC has a surplus of plain box cars on its lines and the acquisition of additional plain box cars by FEC would be a wasteful and improvident use of resources, (c) operating practices of FEC assure efficient use and the prompt return of plain box cars received from connecting lines, and (d) imposition of the proposed incentive per diem charges would, in addition to the recently approved per diem-mileage charges, impose an unreasonable cost burden on traffic handled in plain box cars and on the entire operation of FEC.

The attached verified statements of Mr. Masters and Mr. Taylor establish, among other facts:

a. FEC can not efficiently use a larger number of plain box cars than those presently owned by FEC.

b. FEC consistently terminates a substantially higher percentage of interline carloads of freight, including freight moving in plain box cars, than it originates.

c. FEC can not load the plain box cars now on its lines; three of every four plain box cars are returned empty to connecting lines for lack of suitable revenue freight for such equipment.

d. FEC ownership of additional plain box cars would result in greater inefficiency in the use of box cars.

e. FEC now handles box cars promptly and efficiently and with a minimum of delay in the return of the cars to connecting lines; the imposition of an incentive charge would not produce a more prompt or efficient movement of cars by FEC.

f. FEC, because of operating conditions and geographic location, can

not avoid being a substantial per diem debtor.

g. The proposed incentive charges, if applied to FEC's operations during the four-month period, September 1, 1969 to December 31, 1969, would have increased equipment rents by $108,951.57, an average of $27,000.00 each month.

2. FEC is opposed to the imposition of incentive charges on plain box cars and believes that an attempt to impose such charges on the basis of the evidence in this proceeding and the interim report of the Commission would be unlawful.

Imposition of the proposed incentive charges on plain box cars, without restructuring the rates, divisions, and demurrage charges to take account of the cost burden placed on terminating carriers, such as FEC, would be unlawful and would present substantial constitutional questions.

Imposition of the proposed incentive per diem charges can not be supported by the evidence in this proceeding. The data relied upon by the Commission in the interim report does not establish the existence of box car shortages or that the proposed incentive charge would be effective in reducing claimed deficiencies in the availability of box cars for shipper loadings. The conclusions in the interim report appear to contradict conclusions respecting the adequacy of existing car fleets and the availability of cars for loading expressed by the Commission at other places on the same record of railroad performance.

A hearing is essential as a matter of law under section 1(14) (a) of the Act

to develop an adequate record on the basic factual issues to be resolved by the Commission. FEC, accordingly, requests an oral hearing and oral argument before the Commission.

## III. FEC SHOULD BE EXEMPTED FROM INCENTIVE PER DIEM CHARGES

*A. Congress Provided in Section 1 (14) (a) An Exemption From Incentive Charges For Terminating Lines*

Section 1(14) (a), as amended, provides that "The Commission * * * may exempt from the compensation to be paid by any group of carriers such incentive element or elements if the Commission finds it to be in the national interest." The legislative history of Public Law 89–430, 80 Stat. 168, now section 1(14) (a), establishes that this provision was intended to authorize an exemption from incentive per diem charges for carriers, such as the FEC, terminating a substantially higher percentage of interline traffic than they originate. During the course of the hearings on Senate Bill No. 1098, later enacted as Public Law 89–430, it was repeatedly indicated that a railroad meets its common carrier responsibilities when it owns or otherwise provides freight cars of various types, which, together with foreign cars used in accordance with the car service rules, are sufficient in number to protect the loads it originates.[1]

S. 1098 provided, as passed by the Senate, that the Commission was authorized to make any incentive element in per diem charges inapplicable "(1) to carriers determined by the Commission

---

1. See Statements of Chairman Webb of the Commission, Hearings Before Freight Car Shortage Subcommittee of the Committee on Commerce, United States Senate, 89th Cong., 1st Sess., Ser.No. 89–23, p. 13 (1965) ;. and Hearings Before Committee on Interstate and Foreign Commerce, House of Representatives, 89th Cong., 1st Sess., Ser.No. 89–26 (1965), at page 44:

It is extremely difficult to determine whether the number of cars owned by

a particular carrier represents a fair and equitable contribution to the total number required for a reasonably adequate national supply.

In general, however, it would seem that each railroad should own freight cars of various types which, together with foreign cars used in strict accordance with car service rules, are sufficient in number to protect the loadings it originates.

as owning an adequate number of freight cars to meet their responsibilities to the needs of commerce and the national defense; (2) to carriers which terminate a substantially higher percentage of interline traffic than they originate; (3) to types of freight cars the supply of which the Commission finds to be adequate; and (4) to such other cases or circumstances as the Commission finds to be in the public interest." [2] The House of Representatives substituted for this explicit provision the more general language now found in section 1(14) (a), authorizing exemption of any group of carriers if found to be in the national interest.[3] It is clear, however, that the change in language was not intended to remove the exemption of these groups of carriers from any incentive per diem charge. Debate on the bill in the House pointed out that the Commission [4] was to make exemptions on the basis of the factors specified in the Senate bill.[5]

The Senate acceded to the language used by the House. During Senate consideration of the amended bill, it was made clear that the revised language had not eliminated the objectives of the original bill and that the statute was to be administered as to exempt from any incentive per diem terminating railroads and those railroads with an adequate supply of cars.[6]

2. 111 Cong.Rec. 14827 (1965).

3. With respect to the Senate Bill, Chairman Webb of the Commission, testifying before the House Committee on Interstate and Foreign Commerce, stated:

> The Commission did not object to the Senate Amendment because all the factors specified therein would have been considered under the language of the bill, as introduced, and would be considered, of course, under the language of H.R. 7165. Hearings Before the House, *supra*, p. 5 n. 1.

4. The comment of Commissioner William H. Tucker, the Commission's Acting Chairman of the Committee on Legislation, responding to a final proposed House amendment to S. 1098 designed to preclude any carrier exempted from incentive per diem payment from receiving payment, is particularly illuminating. Writing in opposition to the Kornegay amendment, Commissioner Tucker said, in part:

> * * * Valid reasons may warrant a carrier being made exempt from paying an incentive element and yet remain entitled to receive an incentive element for its own cars. This may be because of the carrier's contribution to the car fleet, the type of carrier involved, or other considerations which may be developed during the hearing.
>
> We also observe that the incentive element is intended not only to encourage carriers owning an adequate supply of cars to build more cars, but to provide those carriers owning an adequate supply a sufficient return to encourage them to continue to build

> more cars. Under the suggested proposed amendment, however, it would appear that a carrier exempted from paying the incentive element because it has an adequate supply of cars, would also be precluded from receiving the incentive element necessary to encourage it to contribute to the freight car supply. 112 Cong.Rec. 9961 (1966). The Kornegay amendment was later defeated, leaving the more general language intact. *Id.* at 9964.

5. The Chairman of the House Interstate and Foreign Commerce Committee stated:

> * * * This provision enables the Commission to make exemptions from paying an incentive by class of carrier, and permits the Commission to consider the several factors specifically authorized in the Senate Bill. 112 Cong. Rec. 9946 (1966).

> He further stated during debate:

> * * * all this does to the House (sic) version is just sharpens up the objectives and aims. * * * It does give to the Interstate Commerce Commission the opportunity, after hearings, to exempt certain railroads. This is intended for railroads in the gentleman's area [Massachusetts], as the gentleman knows. *Id.* at 9962.

6. Senator Cotton said during Senate consideration of the bill, as changed by the House of Representatives:

> The aim of these provisions of the Senate Bill, which I had a part in suggesting, was to assure reasonable and fair consideration of the special problems arising in the industry, including the problem of terminating railroads, whose per diem charges are not re-

The Commission's interim report does not consider whether any rail carrier or class of rail carriers should be exempted from payment of the proposed incentive charges. A final determination to impose incentive charges will require Commission consideration and decision on this point. The verified statements of Mr. Masters and Mr. Taylor contain detailed evidence supporting FEC's exemption from any incentive charge. We set out below, in summary fashion, the factors establishing that FEC should be exempted from any incentive per diem charge.

### B. FEC Is A Terminating Line With A Surplus Of Plain Box Cars

FEC is a terminating railroad because of geographic location, the consist of its traffic, and the operating conditions unique to its lines.

FEC's main line parallels the east coast of Florida between Jacksonville and Miami. FEC connects at Jacksonville with the Southern Railway and Seaboard Coast Line.

In the six-month period, September 1, 1968 through February 28, 1969, FEC terminated 47,118 carloads of revenue freight but originated only 24,731 carloads. The ratio of plain box cars loaded to those terminated was even lower during this period—12,180 terminated and 3,402 loaded. During the 17-month period beginning September 1, 1968 and ending January 31, 1970, FEC terminated 33,301 plain box cars and loaded only 8,733. Virtually all loaded box cars moved by FEC are received at Jacksonville for southbound movement and are returned empty to Jacksonville. Thus, in January and February 1970, FEC received from connections 3,586 plain box cars but delivered to connections empty 2,527 plain box cars.

FEC's position as a terminating road is further affected by the fact that most of the traffic received from connecting lines terminates at the south end of the line—the area of West Palm Beach and south, including Miami. For instance, of 87,445 cars received from connections in the year 1969 destined to all stations served by FEC, 61,753 were received at Jacksonville for termination at West Palm Beach and south, including Miami. As a result, FEC is compelled to move foreign interline cars virtually the entire length of the Florida peninsula and the return to Jacksonville empty. FEC's ratio of empty to loaded car-miles reflects this operating situation. In 1969, the ratio was 94 percent. The ratio has been 90 percent or more in every year since 1962.

FEC is a terminating line because the products shipped from the east coast of Florida, the area served by the lines of FEC, are generally not suitable for movement in the equipment used to

lated to the number of boxcars they may own.

In the bill before us today, as it has come back from the House of Representatives, the four types of circumstances spelled out in the Senate bill are not directly listed. It is clear, however, that all the factors listed in the Senate bill still have to be considered by the Interstate Commerce Commission, and the Commission would have the power, and the duty, not to apply the incentive element to any group of carriers, and even a single carrier, where those four circumstances, or any other circumstances, made it in the National interest to do so.

\*　　\*　　\*　　\*　　\*

I am supporting these amendments with the understanding that it is clear from the extensive legislative history of this bill that it gives the Commission the power, and the responsibility to exempt from the incentive per diem those carriers who terminate a substantially higher percentage of interline traffic than they originate. I am confident that the Commission recognizes its responsibilities in this respect and that the intent of the Congress will be fully implemented. 112 Cong. Rec. 10250–10251 (1966).

Senator Pastore later asked Senator Magnuson, Chairman of the Senate Commerce Committee, whether the bill, as changed by the House, retained the provision involving a terminal line like the New Haven. Senator Magnuson replied, "That is in the bill." Ibid.

transport incoming traffic, in addition to the fact that the southbound volume of traffic exceeds northbound shipments. During 1969, FEC received from connections 87,445 carloads of revenue freight, while originating and delivering to connections 48,359 carloads. Of the 48,359 carloads delivered to connections, 37,808 cars were farm produce requiring movement in refrigerator equipment. The freight received from connections, on the other hand, required box, gondola, hopper, and flat cars not suitable for farm produce originated by FEC.

Acquisition by FEC of any substantial number of box cars under these operating conditions is useless and an improvident use of resources. Additional plain box car ownership would result in either non-use of the equipment or further inflation of empty miles of car use. Imposition of the proposed incentive charge would not, under these circumstances, provide an incentive for the addition of plain box cars by the FEC.

### C. FEC Moves Plain Box Cars With Dispatch And Returns Foreign Cars To Connecting Lines Promptly

FEC has been successful in moving foreign cars efficiently and in holding the time plain box cars of foreign ownership spent on line to a minimum. The train and switching schedules, the car distribution and control program, and other operating procedures used by FEC to expedite movement of cars are detailed in Mr. Taylor's verified statement. FEC's average time on line (from date received to date of return to conections) of plain box cars is less than seven days. On multi-level rack cars, where there is no delay in unloading by the consignees,

FEC has consistently achieved the highest average number of miles per day of any railroad in the United States. Any significant reduction in the time plain box cars remain on FEC's line must come from a reduction in the unloading time of consignees.[7] It is certain that the imposition of an incentive charge on plain box cars in the amounts proposed by the Commission or in any other amount to be paid by FEC will not and can not produce a more efficient use of plain box cars by FEC.

### D. Incentive Charges Would Impose An Unreasonable Burden On FEC

FEC is and has always been a substantial per diem debtor. In 1969, net car hire payable by FEC was $1,777,417, approximately 5½ percent of total railway operating revenues. If the proposed scale of incentive charges had been applied to the plain box cars handled by FEC during the months of September through December 1969, FEC car hire would have been increased $108,951.57, an average of $27,000 per month. This is a significant increase in the cost of handling freight moving in plain box cars. This proposed incentive charge, moreover, will in the future be added to increased per diem charges prescribed by the Commission in Docket No. 31358. If these increased per diem-mileage charges had been effective during the months of August through December 1969, the basic per diem charge for plain box cars would have averaged $5,000 higher per month.[8]

FEC has not had adequate time to determine the extent to which the additional cost of the proposed incentive charge would make traffic moving in

7. Present rules generally allow 48 hours free time for unloading on domestic traffic and five days free time on port traffic. FEC serves ports at Miami, Fort Lauderdale (Everglades), Palm Beach, and Fort Pierce.

8. Application of the per diem charges prescribed in Docket No. 31358 to all types of cars including plain box cars handled

by FEC during September-December 1969 results in an average monthly increase for FEC of $8,000 in per diem costs, an increase of 4 to 5 percent in per diem charges. Little, if any, of the increased cost will be offset by increased receipts from foreign line use of FEC cars because of the type of car owned by FEC and the shorthaul movements in which FEC cars now participate.

plain box cars non-compensatory at existing tariff rates and charges. One fact, however, is certain. The proposed incentive per diem alone, applied over a period of six months, would exceed the net railway income of FEC in 1967 and 1968.

## IV. NEITHER THE INTERIM REPORT NOR THE EVIDENCE BEFORE THE COMMISSION ESTABLISHES THAT AN INCENTIVE CHARGE IS JUSTIFIED OR THAT THE PROPOSED CHARGE WILL ACHIEVE THE OBJECTIVES SPECIFIED IN THE ACT

The conclusions as to the adequacy of the supply of plain box cars in the interim report are based upon data reported by rail carriers in response to directions and forms furnished by the Commission. The study is described in Appendix A and the data obtained is summarized in Appendices C and D of the interim report. The information furnished to the Commission in this study also formed the basis of a report made by the Commission to the Senate Commerce Committee in May 1969. In that report, the then Chairman of the Commission stated that an analysis of the data showed:

> * * * [E]very zone has had available daily a supply of every type which exceeded demands [by shippers], represented by orders on hand at the beginning of the day, and by orders requesting placement on the same day. In most cases, the daily receipt of cars has exceeded such orders and the cars on hand at the beginning of the day substantially exceed current demands.[9]

The Chairman further characterized the current shortage not as a lack of an adequate supply, but rather as "a failure in actually placing available cars in response to a shipper request."[10]

In these circumstances, the number of plain box cars owned by railroads can not be found the cause of any failure promptly to supply cars to shippers. More importantly, there is no factual basis for a conclusion that an increase in the number of plain box cars would result in the prompt placement of box cars at stations reporting an inability to furnish all cars on the day ordered. Additional cars would undoubtedly fall into existing patterns of dislocation. A supply of box cars adequate to make all placements on the day ordered at all stations in the United States at all times of the year would require astronomical numbers of cars. Such level of ownership would be wasteful and inefficient in the extreme. It is doubtful, to say the least, if the railroad industry could finance car ownership at such a level. The enormous cost of service that such a level of ownership would impose on commodities moving in box cars could never be justified.

The interim report treats the failure to place a box car on the day ordered as a deficiency. This is an unreasonable standard. The Commission's report to the Senate Commerce Committee pointed out the difficulties in this standard of performance. Chairman Brown told the Senate Committee:

> Reliance on these statistics for a measure of any inadequacy of car supply, of course, involves an assumption that it is reasonable to require the railroads to fill every order on the day for which the cars are requested and that a shipper who requests prompter service, no matter how preemptory that request may be in relation to the demands of all shippers for the same type of car, is entitled to such service. This assumption may be unwarranted, and the study provides data by means of which allowance can be made for the effect of the assumption.[11]

9. See Statement of Virginia Mae Brown, Chairman, Interstate Commerce Commission, Railroad Freight Car Shortages Before Committee on Commerce, United States Senate, May 13, 1969, p. 8.

10. *Id.*, Statement at p. 8.

11. *Id.*, Statement at p. 14.

\* \* \* \* \* \*

\* \* \* the data seem to warrant the conclusion that, with the present efficiency of car distribution, delay in filling orders within two days after they are received so far as orders requesting placement on the day they are filed or the first day thereafter should not be considered excessive.[12]

The members of the Commission's own staff with experience in car service matters have repeatedly stated under oath that it is unreasonable to expect carriers to place cars within 24 hours of receipt of an order, particularly in periods of peak demand.[13]

Mr. Taylor's verified statement, attached to these representations, details the practical operating problems that may and do prevent placing a car at a shipper's location for loading on the day the car is ordered, even though the carrier has an ample supply of suitable equipment. This evidence establishes that, at least for the FEC, the data obtained in the Commission's study as to "deficiency" in placement can not be related to the adequacy of the number of cars owned by rail carriers.

V. IMPOSITION OF INCENTIVE CHARGES WITHOUT RESTRUCTURING EXISTING RATES AND DIVISIONS WOULD BE UNLAWFUL AND RAISE SERIOUS CONSTITUTIONAL ISSUES

Imposition of the proposed incentive charge would require substantial changes in the existing rates, divisions, and demurrage charges on traffic moving in plain box cars. Substantial increases in the FEC revenues for handling such traffic would be essential.

The heavy burden that an incentive charge might place upon the terminating carriers was recognized during the Congressional hearings on the present section 1(14) (a). Testifying on S. 1098, Chairman Webb observed that, to the extent incentive per diem increased the burden upon terminating carriers, such as the Boston and Maine and New Haven, that burden could be offset through an appropriate adjustment of the divisions between carriers.[14]

FEC recognizes that any proposal to modify existing rates or divisions of revenue would present a number of important issues. For example, may division of revenue between carriers be adjusted to permit recovery of the increased per diem incurred without actually nullifying the incentive intended by the Act? Are incentive per diem payments to be considered as part of the operating cost of a rail carrier for purposes of rate regulation and, accordingly, considered as justification for an increase in rates?

This incentive per diem proceeding rests upon the proposition that the FEC is responsible for a share of the national demand for freight cars. The national demand for cars is the total of the demands made on all railroads. Demand for cars to transport any commodity depends upon a number of factors, including the rate established by the railroad or railroads involved vis-a-vis other modes of transport. Competition from other carriers, and from other modes of transportation, have led to reductions that may produce non-compensatory rates unless the traffic is moved in newly designed cars rather than standard box cars.[15] The result is that such railroads can and do create a requirement for additional box cars through rate adjustments. Demand for cars and the need for additional cars to move traffic tendered to railroads may be affected by operating practices of the carriers. FEC has no way to control or veto the rates for the movement of shipments in which FEC

---

12. *Id.*, Statement at pp. 16–17.

13. See Ex Parte No. 241, testimony of Witness Kline, Tr. 356–359, 1234, 1236.

14. Hearings Before the Senate, *supra*, p. 5 n. 1.

15. See, *e. g.*, I&S Docket No. 7656, Grain in Multiple-Car Shipments—River Crossings to the South; and the application of reduced rates to movement of grain in conventional box cars as well as in jumbo hopper cars.

does not participate. Nor does FEC control the practices of other lines affecting the use of and need for cars. How then can FEC be responsible for supplying a share of the equipment made necessary by these rate practices?

Unless exempted from the imposition of any incentive per diem, much of the interline traffic now handled by FEC will be transported at a loss. As a common carrier under section 1 of the Act, FEC is obligated to provide transportation service upon reasonable request and participate in through routes. FEC may not be able, therefore, to decline to transport over its lines loaded cars which carry an incentive or an increased per diem rate. The Act, however, specifies that a railroad shall be permitted to charge and receive just compensation for services required to be performed. Imposition of incentive per diem, at a level which is either in excess of just and reasonable compensation to the car owner or results in the receipt by FEC of less than just compensation for services performed, would raise substantial questions affecting the validity of this proceeding and the underlying statute.

## VI. REQUEST FOR ORAL HEARING AND ORAL ARGUMENT

Oral hearing and oral argument are required to develop an adequate record for disposition of this proceeding and to comply with applicable statutes.

Section 1(14) (a) of the Act authorizes the Commission "after hearing" to fix the compensation, including elements of incentive, paid by railroads for use of cars owned by other roads. The legislative history of that section establishes that Congress contemplated unrestricted public hearings.[16] Moreover, since Commission imposition of an incentive charge involves a determination that is "re-

quired by statute to be determined on the record after opportunity for agency hearing,"[17] and oral hearing is required by section 7 of the Administrative Procedure Act.[18] Section 7 of the Administrative Procedure Act further provides that the proponent of the rate or order has the burden of proof. That burden is not discharged by an "interim" Commission report containing evidentiary findings and conclusions based upon data collected from the individual railroads. Adversely affected railroads must be provided an opportunity to test the factual claims and the reliability of the underlying data through cross-examination.

FEC expects at an oral hearing to compel the attendance of those employees of the Commission who supervised and directed the study summarized in the appendices to the interim report and those Commission employees familiar with railroad car service matters who testified in the prior proceedings in Ex Parte No. 252.[19] FEC expects to establish, by cross-examination of such persons, the following facts, among others:

a. Deficiencies reported in the study conducted by the Commission may not be affected by the supply of cars available at a reporting station, on a reporting railroad, or in a statistical region.

b. Railroad ownership of additional plain box cars would not necessarily change the results summarized in the appendices to the interim report.

c. No computation has been or can be made on the evidence before the Commission in this proceeding of the number of additional box cars that would be needed to furnish on the day ordered all plain box cars at all stations during the period

16. 112 Cong.Rec. 9945, 9953–54 (1965).

17. 5 U.S.C. § 554(a).

18. 5 U.S.C. § 556(d), in pertinent part, provides: "A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence,

and to conduct such cross-examination as may be required for a full and true disclosure of the facts."

19. A list of such persons will be supplied by FEC as required by Commission procedures in advance of the hearing.

September 1 through February 28 of each year.

d. It is unreasonable to expect rail carriers to supply for loading within 24 hours a plain box car in all instances.

CONCLUSION

FEC submits that the proposed incentive charge should not be imposed or, alternatively, FEC should be exempted from any incentive charge prescribed in this proceeding.

Respectfully submitted,

A. ALVIS LAYNE

EUGENE M. MALKIN

915 Pennsylvania Building
Washington, D. C. 20004

Attorneys for Florida East
Coast Railway Company

Due and Filed:
March 17, 1970

Note:

(Supporting Statements and Statistical Data have been omitted by the Court from this document.)